**UNITED STATES of America, Appellee,**

**v.**

**John P. ROONEY, Jr., Defendant–Appellant.**

**No. 1057, Docket 93–1625.**

United States Court of Appeals, Second Circuit.

Argued March 11, 1994.

Decided Oct. 4, 1994.

J. Shane Creamer, Philadelphia, PA (Dilworth, Paxson, Kalish & Kauffman, of counsel), for defendant-appellant.

Paul D. Silver, Asst. U.S. Atty., Albany (Gary L. Sharpe, U.S. Atty. for the N.D. of N.Y.), for appellee.

Before: WALKER and JACOBS, Circuit Judges, and OWEN, District Judge.*

WALKER, Circuit Judge:

This case presents the question of whether a broadly worded federal bribery statute can criminalize a demand by a real estate developer for further contracting services in return for prompter and more certain payment to the contractor by the developer making the demand. Defendant, a lawyer and sometime real estate developer, was convicted following a jury trial in the Northern District of New York (Bernard A. Friedman, *Judge*, of the Eastern District of Michigan, sitting by designation) of corruptly soliciting a thing of value intending to be influenced in connection with a federally funded housing project, in violation of 18 U.S.C. § 666(a)(1)(B) (Count III). Defendant was also convicted of making a false statement and concealing a material fact in a submission to the government, in violation of 18 U.S.C. § 1001 (Counts I and II). For the reasons that follow, we reverse the judgment of conviction on Count III and remand with instructions for the district court to dismiss that count. On Counts I and II, we vacate the judgment of conviction and remand for further proceedings consistent with this opinion.

## BACKGROUND

The defendant, John P. Rooney, Jr., is an attorney who undertook to develop a modest federally-funded housing project for the elderly in Columbia County, New York. Rooney and his wife formed a partnership, Dawnwood Properties, to be the project manager. The project was funded through the Farmers Home Administration ("FmHA"), a federal agency, which sets strict conditions on its lending for such projects. The FmHA insists on a first priority mortgage; requires, in addition to a promissory note, a security agreement pledging the project's revenue and fixtures; and demands that applicants contribute at least five percent of the projected cost of the project. Further, the FmHA limits an applicant's return on investment to eight percent. Rooney complied with these

requirements. He met the capital requirement by contributing as the project's site two acres of land out of a larger undivided tract of seventy acres that he owned.

The FmHA advanced funds to meet the costs of the project. These costs are generally broken down into "hard" costs, which are basically the costs of construction, and "soft" costs, which include all other allowable costs of a project such as attorneys fees, architect fees, closing costs and title insurance. Soft costs may be estimated and funds for them loaned in advance, but the FmHA then requires receipts substantiating these costs before further soft cost monies are loaned.

DeBrino Caulking, the general contractor, began construction in 1985. In due course, Rooney submitted receipts to the FmHA for soft cost expenditures paid with monies advanced by the agency. It is the alleged impropriety of one of these receipts that is the basis for the two § 1001 violations charged in Counts I and II of the indictment. The details of this occurrence will be set forth later in this opinion.

The facts giving rise to Count III were unrelated to the submission of cost justifications to the FmHA. Rather, they largely concerned Rooney's dealings with the general contractor, DeBrino Caulking. By late 1989, the project had experienced numerous construction delays and had substantially exceeded its initial cost projection. These delays were partly attributable to ongoing disagreements between Rooney and DeBrino Caulking's president Lewis Houghtaling.

By February of 1990, some five years into the project, the FmHA's loans amounted to $1,042,000, but still additional costs had been incurred. As general partner of Dawnwood Properties, Rooney was personally obligated to pay the contractor for such additional costs as well as to repay all funds borrowed through the FmHA. Thus, Rooney had a choice. He could remain personally liable to DeBrino Caulking for these additional costs, or he could apply for more loans from the FmHA to immediately pay off DeBrino

---

* The Honorable Richard Owen, United States District Judge for the Southern District of New York, sitting by designation.

Caulking, but thereby increase his own indebtedness to the agency.

Rooney, knowing that Houghtaling preferred immediate payment, tried to capitalize on this option by asking during a conversation with Houghtaling that, in return for obtaining further lending from the FmHA, the contractor install a pond adjacent to the development at no additional cost to the project. If Houghtaling would construct the pond, at a cost to DeBrino Caulking not to exceed $26,000, Rooney would apply for further funds from the FmHA to pay off the additional costs of the project. If not, Rooney would continue to owe DeBrino Caulking directly. All parties agree that, since the pond would alter the scope of the project, it would have had to be approved by the FmHA.

Uncomfortable with Rooney's proposal, Houghtaling contacted an official at the FmHA who convinced him to tape record conversations with Rooney. During these recorded conversations, which constituted the government's primary evidence on Count III, Rooney reiterated his proposal to Houghtaling. At trial and on this appeal, it has been the government's position that Rooney's offer to apply for additional FmHA loans to make prompt payment to DeBrino Caulking in exchange for the construction of the pond constituted a corrupt solicitation in violation of 18 U.S.C. § 666(a)(1)(B). Houghtaling eventually rejected Rooney's deal, and no pond was ever constructed.

The jury returned a guilty verdict on all three counts. The district court denied Rooney's post-trial motion for judgment of acquittal and sentenced him to five months' confinement at a community correctional facility to be followed by five months' home detention, and other monetary penalties. This appeal followed and Rooney has remained free on bail pending its disposition.

## DISCUSSION

### I. *18 U.S.C. § 666 (Count III)*

We begin our discussion with Count III, in which Rooney was convicted of corruptly soliciting a thing of value intending to be influenced in connection with a federally funded project in violation of 18 U.S.C. § 666(a)(1)(B). We note at the outset that the facts in this case are a departure from the typical § 666 prosecution. In the usual § 666(a)(1)(B) case, a government employee or private individual demands or accepts a kickback, personal bribe, or gratuity from an individual in exchange for the awarding of a contract, the disbursement of federal funds, or some other favorable treatment. *See, e.g., United States v. Coyne,* 4 F.3d 100, 111 (2d Cir.1993) (county executive provided assistance in obtaining architectural contract for individual in exchange for $30,000 payment), *cert. denied,* —— U.S. ——, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994); *United States v. Santopietro,* 996 F.2d 17, 18 (2d Cir.1993) (mayor used his political position to influence decisions by various city agencies in return for bank loans and cash payoffs), *cert. denied,* —— U.S. ——, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994); *United States v. Concepcion,* 795 F.Supp. 1262, 1268 (E.D.N.Y.1992) (employee of New York City Human Resources Administration assisted in welfare fraud in exchange for cash payments). In such cases, the government's interests are sacrificed by the corrupt activities of the responsible parties.

In this case, by contrast, Rooney is not a public official. Nor is he a member of a private nonprofit organization which has responsibility for distributing federal funds. Rather, he is a private individual involved in a private development project that happens to have as its lender the federal agency FmHA. Further, unlike the typical case, the charge against Rooney is unrelated to any dispensing of government largesse. Rather, as a private developer, Rooney remains personally liable for the costs of the project, whether to the contractor directly or to the FmHA for loans made on behalf of the project. Thus, the only government favor that Rooney had within his control to dole out was the proceeds of a FmHA loan upon which he himself would remain liable. Finally, Rooney did not seek to divert government funds for the project to himself through a kickback or otherwise. Neither party has brought to our attention nor has our own research disclosed

any case in which § 666 has been applied in such a situation.

■ Our concern in this opinion is with the allowable reach of § 666. When evaluating the scope of a federal criminal statute, we must look closely to its language, legislative history, and purpose. *See Dowling v. United States,* 473 U.S. 207, 214–18, 105 S.Ct. 3127, 3131–34, 87 L.Ed.2d 152 (1985); *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). We are also mindful of the proposition that "[b]ecause interpretations of criminal statutes which would 'criminalize a broad range of apparently innocent conduct' are disfavored, it is our task to ascertain whether Congress intended the statute to be so all-encompassing." *United States v. Yip,* 930 F.2d 142, 149 (2d Cir.) (quoting *Liparota v. United States,* 471 U.S. 419, 426–27, 105 S.Ct. 2084, 2088–89, 85 L.Ed.2d 434 (1985)), *cert. denied,* —— U.S. ——, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991).

■ In beginning our analysis, it is important to understand the context in which § 666 was enacted. Section 666 was originally enacted in 1984 in response to several federal appellate decisions that held that state and local government officials and members of private organizations that distribute federal monies did not fall within the definition of a "public official" subject to the provisions of the federal bribery statute, 18 U.S.C. § 201. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510. According to the Senate Report, § 666 was enacted "to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." *Id.* The provision, modeled after the bribery statute, 18 U.S.C. § 201, expanded the class of individuals subject to federal penalties for prohibited conduct to virtually anyone who either receives federal funds or participates in a federal program that meets the jurisdictional threshold. Congress intended the terms of the statute to be "construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Id.* at 3511. Thus, as is evident from the circumstances surrounding its adoption, § 666's manifest purpose is to safeguard finite federal resources from corruption and to police those with control of federal funds. *See generally, United States v. Crozier,* 987 F.2d 893, 898–900 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 222, 126 L.Ed.2d 177 (1993).

With this background in mind, we examine the pertinent statutory language of § 666, entitled "Theft or bribery concerning programs receiving Federal funds," which provides:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

\* \* \* \* \* \*

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

\* \* \* \* \* \*

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstances referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

\* \* \* \* \* \*

18 U.S.C. § 666.

As we explained in our prior decision in this case in which we reversed the district

court's pre-trial dismissal of Count III, Rooney's investment enterprise, Dawnwood Properties, qualifies under subsection (b) as an organization that received in any one year "benefits in excess of $10,000 under a Federal program." *See United States v. Rooney,* 986 F.2d 31, 33 (2d Cir.1993) (holding that the loans received by Dawnwood Properties from the FmHA constitute a benefit under § 666(b)). Further, there is no dispute that Rooney was an agent of Dawnwood Properties sufficient to meet subsection (a)'s requirements. Thus, the threshold requirements are met for the application of § 666(a)(1)(B) to Rooney's conduct in this case.

■ In conspicuous breadth, § 666(a)(1)(B) prohibits any corrupt solicitation or demand of anything of value by an individual intending to be influenced or rewarded in connection with any business of the organizational entity involving anything of value of $5,000 or more. As mentioned earlier, it was the government's theory at trial that Rooney's offer to apply for further FmHA funds so he could immediately pay DeBrino Caulking in exchange for the contractor's construction of a pond adjacent to the project constituted a corrupt solicitation of a thing of value by Rooney.

There is no dispute that Rooney solicited something of value and did so intending to be influenced in connection with some business or transaction of Dawnwood Properties. Thus, his conduct, if done corruptly, would apparently be covered by § 666. The question for decision, therefore, is whether the *quid pro quo* exchange suggested by Rooney, drawing all fact inferences in the government's favor, can amount to a "corrupt" solicitation.

Rooney argues that his offer to apply for a FmHA loan in exchange for the construction of a pond amounted to nothing more than aggressive negotiation designed to capitalize on the premium DeBrino Caulking would place on the right to immediate and uncontested payment, and that such negotiation tactics, designed to enhance the value of a government-supported project and thereby advance the government's interests, cannot be considered "corrupt" within the ambit of

§ 666. Rooney claims further that since he is charged with violating the "bribery component" of § 666, *see Crozier,* 987 F.2d at 898–900 (pointing out that § 666 applies to both bribery and gratuity theories), such a violation requires some breach of duty. He argues that his solicitation to Houghtaling cannot be considered "corrupt" because he violated no duty. We agree.

■ As is evident in many of our cases dealing with bribery, a fundamental component of a "corrupt" act is a breach of some official duty owed to the government or the public at large. In *United States ex rel. Sollazzo v. Esperdy,* 285 F.2d 341 (2d Cir.), cert. denied, 366 U.S. 905, 81 S.Ct. 1049, 6 L.Ed.2d 204 (1961), we said that "[b]ribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty." *Id.* at 342. Similarly, in *United States v. Jacobs,* 431 F.2d 754 (2d Cir.1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971), we pointed out that "[t]he evil sought to be prevented by the deterrent effect of [the bribery statute] is the aftermath suffered by the public when an official is corrupted and thereby perfidiously fails to perform his public service and duty." *Id.* at 759. Finally, in *United States v. Zacher,* 586 F.2d 912 (2d Cir.1978), we recognized that "[t]he common thread that runs through common law and statutory formulations of the crime of bribery is the element of corruption, breach of trust, or violation of duty." *Id.* at 915.

The idea that corruption requires some breach of duty comports with the concept's dictionary definitions. One leading dictionary defines "corruption" as an "inducement (as of a political official) by means of improper considerations (as bribery) to commit a violation of duty." *Webster's Third New International Dictionary* 512 (Philip B. Gove ed., 1981). Similarly, *Black's Law Dictionary* defines "corruption" as "[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others." *Black's Law Dictionary* 311 (5th ed. 1979). Thus, it is clear to us that the use of the term corruptly in § 666 entails the

violation of some duty owed to the government or to the public in general.

As discussed above, the typical § 666 case easily meets this test. It is an obvious violation of duty and public trust for a public official or some other person responsible for parcelling out government benefits to accept or demand a personal benefit intending to be improperly influenced in one's official duties. *See, e.g., Coyne,* 4 F.3d at 111 (county executive); *Santopietro,* 996 F.2d at 18 (mayor); *United States v. Simas,* 937 F.2d 459, 461 (9th Cir.1991) (manager of local transit authority); *United States v. Westmoreland,* 841 F.2d 572, 573 (5th Cir.) (county supervisor), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988); *Concepcion,* 795 F.Supp. at 1268 (employee of city agency).

█ In contrast, Rooney's duty, as a private developer trying to maximize revenues while minimizing costs, is far less clear. To be sure, he has a duty to the government to faithfully administer the project, and to ensure that expenditures of federal monies are justified and that the funds are distributed properly for the benefit of the project. However, Rooney owes no duty to acquiesce in construction costs he considers unreasonable and no duty to apply for federal funds to meet every obligation on the contract. Here, we do not believe that Rooney breached any duty he owed the government when he conditioned further loan requests and thus prompter payment upon the construction of a pond. He was under no duty to the government either to apply or not to apply for the supplemental government funds, nor did he breach any such duty in seeking to capitalize on his ability to pay DeBrino Caulking immediately with requisitioned FmHA funds. *Compare United States v. Porter,* 591 F.2d 1048, 1054 (5th Cir.1979) ("We cannot locate any duty imposed upon any of these defendants by a statute or regulation, the violation of which would amount to a misapplication of federal funds.").

The government in its brief to this court asserts, "Here, what made defendant's demand corrupt within the meaning of § 666 was his refusal to pay DeBrino [Caulking] the money he already owed without first receiving a ten percent kickback in the form

of the construction of a pond." However, the government mischaracterizes what occurred. Rooney, who remained personally liable on the contract, merely refused to apply for available federal funds unless a pond was constructed. Moreover, what the government characterizes as a "kickback," the construction of the pond, is not comparable to the usual diversion of government funds or secret under-the-table cash payment that § 666 was largely designed to prevent. The addition to the project Rooney requested would have to be submitted to the FmHA for approval and would have benefitted the project.

As might be expected, at oral argument the government had considerable difficulty defending its construction of the statute to cover Rooney's conduct. Faced with questions from the court as to how Rooney's conduct injured the government or public at large, and thus how a duty owed had been transgressed, the government maintained that such an injury was irrelevant. Counsel went so far as to suggest that even a simple demand for a reduction in price in return for applying for the FmHA loan would "probably" be a violation of § 666. So too would any demand on the contractor, however slight, to provide upgraded services in return for submitting the loan request:

THE COURT: Suppose the kickback had been in the form of a superior quality of furnishings in the old age home?

MR. SILVER: I maintain that still falls within the statute because—he [Rooney] is the project.

THE COURT: That has to be your position.

MR. SILVER: Right.

THE COURT: And if he's going to upgrade it from a sort of asphalt roof to a tile roof, or if he's going to pave the parking lot, or if he's going to put in box hedges around it, all of these become kickbacks under your theory?

THE COURT: How is the government hurt if this project turns into the Taj Mahal?

MR. SILVER: That's not the point, your Honor, and it's irrelevant.

By urging a construction of § 666 that admits of no breach of duty to the government,

and indeed accommodates activity that furthers governmental interests, the prosecution reads out of the statute the requirement of corruptness altogether.

The government's construction could lead to the prosecution of a developer for simply negotiating the costs of construction and for driving hard bargains with federal funds at stake. Indeed, prosecuting a developer of a federally funded project under § 666 for asking that additional services be performed for the same contractual price and for linking such contractor concessions to an application for available federal monies would explicitly thwart the express purpose of § 666: "to protect the integrity of the vast sums of money distributed through Federal programs."

We have no reason to believe that Congress would endorse an interpretation so broad as to chill legitimate negotiations by private developers using federal loans. First, as just mentioned, such a regime would frustrate the clear purpose of § 666 to safeguard limited governmental resources by criminalizing practices that tend to keep constructions costs reasonable. Second, we note that Congress apparently did not intend § 666 to reach normal business dealings: § 666 was amended in 1986 to add a new subsection (c), which states that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." The committee report discussing new subsection (c) states that its purpose is "to avoid [§ 666's] possible application to acceptable commercial and business practices" and that § 666 "does not seek to constrain lawful commercial business transactions." *See* H.R.Rep. 797, 99th Cong., 2d Sess. 30 & n. 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153 & n. 9. In light of the purpose of the statute and the 1986 amendment limiting its scope, we are convinced that Rooney's conduct in this case cannot be considered "corrupt" because he violated no official or public duty owed to the government or the public at large.

In conclusion, we reverse the judgment of conviction as to the § 666 charge in Count

III and remand to the district court with instructions to dismiss that count.

## II. *18 U.S.C. § 1001 (Counts I & II)*

As mentioned above, Rooney's convictions on Counts I and II stem from the allegedly improper submission of a receipt for soft cost expenditures. Briefly, one of Rooney's submissions to the FmHA to justify his initial soft cost advance of $37,593.55 included a receipt for approximately $11,000 for services provided by Monahan Abstract Corporation ("Monahan") associated with the closing costs of acquiring the real estate for the project. Part of these costs went toward the payment of taxes and satisfaction of the existing mortgage on the entire seventy acres of Rooney's property, encumbrances that had to be removed before Rooney could close the deal on the two acre site of the project. Rooney received a receipt from Monahan specifically listing the individual costs from Monahan for "Title Insurance, Title Closing, Including Taxes and Payoff," but he thereafter requested a substitute receipt from Monahan that limited the listing of costs to "Title Insurance, Survey and Closing Costs." It was this latter receipt that Rooney submitted to the FmHA.

The government's theory at trial was that Rooney requested the additional receipt because he knew that he could not properly claim reimbursement for the taxes and mortgage payoff of the entire property. A government witness testified that allowing such reimbursements "would defeat the purpose of the contribution" requirement. Rooney's response to the jury was multifaceted: nowhere is such a policy in writing; the FmHA's own form, which specifically excludes certain soft costs, makes no mention that prior taxes and satisfaction of an existing mortgage are disallowable; no evidence was presented to establish that Rooney was aware of such a policy even if one did exist; these costs were in fact necessary for the deal to close; and finally, no evidence existed that he was out to cheat the FmHA since his contribution of the two acres valued by the FmHA at $60,000 was well in excess of the FmHA capital requirement and remains so

even after subtracting the disputed amount in the Monahan receipt.

> According to 18 U.S.C. § 1001,
>
> Whoever, in any matter with the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001.

Based on submission of the second Monahan receipt, Rooney was charged with concealing a material fact (Count I) and submitting a false statement (Count II). "It is well established that [§ 1001] encompasses within its proscription two distinct offenses, concealment of a material fact and false representations. The objective of both offenses may be the same, to create or foster on the part of a Government agency a misapprehension of the true state of affairs. What must be proved to establish each offense, however, differs significantly. False representations, like common law perjury, require proof of actual falsity; concealment requires proof of wilful nondisclosure by means of a 'trick, scheme, or device.'" *United States v. Diogo*, 320 F.2d 898, 902 (2d Cir.1963) (citations omitted). *See also United States v. Yermian*, 468 U.S. 63, 69, 104 S.Ct. 2936, 2939–40, 82 L.Ed.2d 53 (1984) (pointing out that § 1001's false representations component "[o]n its face … requires that the Government prove that false statements were made knowingly and willfully"); *United States v. Swaim*, 757 F.2d 1530, 1533 (5th Cir.) (listing the elements of a concealment count as "(1) knowingly and willfully; (2) concealing and covering up by trick, scheme or device; (3) a material fact; (4) in any matter within the jurisdiction of a department or agency of the United States"), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985).

■ When an appellate court reverses some but not all counts of a multicount conviction, the court must determine if prejudicial spillover from evidence introduced in support of the reversed count requires the remaining convictions to be upset. When confronted with a problem of taint, we must "consider whether the presence of the [invalidated] count had any spillover effect sufficiently prejudicial to call for reversal" of the remaining counts. *United States v. Ivic*, 700 F.2d 51, 65 (2d Cir.1983); *see also United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (stating that "[p]rejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice" that requires overturning remaining counts).

■ In evaluating a claim of prejudicial spillover of evidence from an invalidated count, courts look to several factors in determining whether the totality of the circumstances requires reversal of some or all of the remaining counts. First, we examine whether the evidence on the reversed count would have tended to incite or arouse the jury into convicting the defendant on the remaining counts. *See Ivic*, 700 F.2d at 65 (considering whether evidence had a "decidedly pejorative connotation" that was "of the sort to arouse the jury"); *United States v. Friedman*, 854 F.2d 535, 582 (2d Cir.1988) (pointing out that evidence on the reversed count was "hardly 'inflammatory'").

■ Second, it is appropriate to look to the similarities and differences between the evidence on the reversed count and the remaining counts. Courts have concluded that where the reversed and the remaining counts arise out of similar facts, and the evidence introduced would have been admissible as to both, the defendant has suffered no prejudice. *See United States v. Bailey*, 859 F.2d 1265, 1273 n. 1 (7th Cir.1988) ("[A]ll of the indictment's charges were similar in character and arose from the same overall scheme [and] most, if not all, of the evidence admitted on [the reversed counts] would have been admitted even absent those counts."), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *United States v. Odom*, 858 F.2d 664, 666–67 (11th Cir.1988) ("Both sets of counts were premised on essentially the same facts. As a result, evidence rele-

vant and admissible as to one set was equally relevant and admissible as to the other. Any 'spillover' which may have occurred therefore was not prejudicial."); *United States v. Townsley*, 843 F.2d 1070, 1081 (8th Cir.1988) (same), *vac'd in part on other grounds*, 856 F.2d 1189 (8th Cir.1988) (en banc), *cert. dismissed*, 499 U.S. 944, 111 S.Ct. 1406, 113 L.Ed.2d 461 (1991). The absence of prejudicial spillover can also be found where the evidence on the reversed and remaining counts are completely dissimilar, thus permitting the inference that the jurors were able to keep the evidence separate in their minds. *See United States v. Pelullo*, 14 F.3d 881, 898 (3d Cir.1994) ("If the evidence was distinct, it is likely that there was no prejudicial spillover effect and no need to reverse the verdict on all counts.").

■ While these two lines of cases appear at first blush to be contradictory, they are in fact consistent. When the reversed and remaining counts arise from an identical fact pattern and all evidence introduced on the reversed count would have been admissible anyway, a defendant will have a difficult time establishing prejudice. Likewise, when the reversed and remaining counts arise from completely distinct fact patterns and the evidence can be easily compartmentalized, we normally will have undiminished faith that a jury has followed the court's instructions and has evaluated each count on the specific evidence attributed to it. It is only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur.

Finally, as is routine when examining potential prejudice in any criminal case, it is appropriate to look to the strength of the government's case on the counts in question. *See, e.g., United States v. Gjurashaj*, 706 F.2d 395, 400 (2d Cir.1983) (reviewing strength of the government's evidence on the remaining counts in rejecting a claim of prejudicial spillover from invalidated count). Now–Chief Judge Newman's discussion of

this matter in *United States v. Guiliano*, 644 F.2d 85, 88–89 (2d Cir.1981), is instructive. In that case, after reversing two counts of a conviction, we evaluated whether a third count could stand. In ordering a new trial on the third count, Judge Newman explained that, although legally sufficient evidence existed to support the conviction, the potential for prejudicial spillover was high because improper evidence was admitted and because "the evidence [on the remaining count] was barely sufficient to permit an inference of the disputed element of knowledge." *Id.* at 89.

■ In light of our precedents, we believe that the totality of the circumstances presented here require that Rooney's conviction on Counts I and II be vacated. First, we believe that the prosecution's depiction of Rooney vis-à-vis his dealings with Houghtaling had a "decidedly pejorative connotation" that was "of the sort to arouse the jury." *Ivic*, 700 F.2d at 65. Referring to Rooney's solicitation to Houghtaling, which formed the basis of Count III but was unrelated to Counts I and II, the prosecution characterized Rooney to the jury in the following manner:

> Mr. Rooney was trying to take advantage of people who were less able to control their own destiny than he was, and he should be found guilty of the offenses charged.

Further, most if not all of the evidence introduced in support of Count III was irrelevant and inadmissible as to Counts I and II. Yet, while the evidence on the § 666 count and the two § 1001 counts was distinct, and the jury would normally be expected to compartmentalize it, the prosecution encouraged the jury to consider the evidence on Count III as bearing on Rooney's culpability on Counts I and II. During the government's jury summation, the prosecutor recounted numerous aspects of the recorded conversations between Rooney and Houghtaling in an attempt to establish Rooney's guilt as to Count III. Curiously, the prosecutor proceeded to use part of this conversation to fortify the government's case on Counts I and II as well:

> If there is any question about whether Mr. Rooney knew that the mortgage payoff

and taxes were not reimbursable soft costs, take a close look at page 22 of the transcript, ... where Mr. Rooney says, No lender is going to give us money to build on someone else's land.

In the portion of the transcript to which the prosecutor refers, however, Rooney was not referring to anything relating to the Monahan receipt. Instead, Rooney was only discussing the potential location of additional housing units and the fact that these units would have to be on the site of the project because "otherwise no lender is going to give us money to build on somebody else's land." However, the statement upon which the prosecutor relies to support Rooney's culpability on Counts I and II would never had been before the jury if not for the presence of Count III. This explicit invocation of evidence pertaining only to Count III and otherwise inadmissible on Counts I and II to bolster the government's case on these counts undermines our confidence that the jury adequately separated the two occurrences.

As for the strength of the case against Rooney on Counts I and II, we note that the jury certainly could have inferred from the circumstantial evidence presented that Rooney knowingly submitted a false statement or that he concealed the true state of affairs: the jury heard testimony that Rooney specifically requested a second receipt from Monahan that left out itemized references to "taxes" and mortgage "payoff," and further that no reasonable real estate developer would have believed that FmHA soft cost expenditures could be properly used to payoff encumbrances on land not dedicated to a FmHA project. However, Rooney correctly points out that the government, quite understandably perhaps, failed to produce any direct evidence that Rooney actually knew that reimbursement of such soft cost expenditures was improper or that he knowingly intended to evade such a policy. The government was hampered by the fact that it could point to no specific written policy prohibiting the use of soft cost outlays for such purposes. The FmHA's own form lists various transactional and financial costs associated with closing, including an allowance for "other costs necessary to closing the FmHA loan," such that a jury might have credited Rooney's defense that he submitted these costs in good faith. Thus, while the jury could quite permissibly have convicted Rooney of knowingly attempting to conceal material facts from or submitting a false statement to the FmHA, a jury could also have a reasonable doubt that Rooney indeed knew that his submitted costs were impermissible and thus had no intent to deceive the FmHA or conceal the true state of affairs.

In light of the government's pejorative depiction of Rooney based on the Count III evidence and the use of Count III evidence otherwise inadmissible to support his conviction on Counts I and II, combined with the view that the government's case on Counts I and II was not overwhelming, we are unable to conclude that Rooney's conviction on the two § 1001 counts did not result from a spillover from the case against him on Count III. We therefore vacate the judgment of conviction on Counts I and II and remand for a new trial should the government choose to proceed further on those counts.

## CONCLUSION

For the forgoing reasons, we reverse the judgment of conviction on Count III and remand with instructions to dismiss that count. We vacate the judgment of conviction on Counts I and II and remand for further proceedings consistent herewith.