**UNITED STATES of America**

v.

**Carl SEITZ.**

**Criminal No. 96–272–2.**

United States District Court,
E.D. Pennsylvania.

Jan. 29, 1997.

Maryanne Donaghy, United States Attorney's Office, Philadelphia, PA, for U.S.

Elizabeth Ainslie, Ainslie & Bronson, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

This case arises out of a Government investigation of a real estate developer, Thomas Spano, and the various ways he attempted to keep his business afloat through the real estate slump in the late 1980s to early 1990s. All of the other defendants in these cases have pled guilty to various offenses involving false statements to financial institutions and concealment of assets from the Resolution Trust Corporation ("RTC"). The Government has charged defendant Carl Seitz with violations of 18 U.S.C. §§ 2 and 1032, alleging that he concealed assets from the RTC and aided and abetted Spano's deceptions.

Seitz has moved for dismissal of the indictment on the ground that the conduct alleged is not a crime. For the reasons stated below, we will grant Seitz's motion and dismiss the indictment against him.

## I. FACTUAL BACKGROUND [1]

At all times relevant to this case, defendant Thomas Spano ("Spano"), was a real

---

**1.** For purposes of deciding this motion, we take as facts the acts alleged in the indictment. *United States v. Polychron,* 841 F.2d 833, 834 (8th Cir.), *cert. denied* 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988).

estate developer who owned T.V. Spano Development Co., and several affiliated construction companies such as: Jupiter Bay Construction Co. ("Jupiter Bay"), Concord II Associates, Inc. ("Jupiter Bay"), Mon Fran Investment Company ("Mon Fran"), First Lathrum Corp. ("First Lathrum"), First Falcon Corp. ("First Falcon"), and First 202 Corp. ("First 202"). On December 29, 1987, Bell Savings Bank ("Bell") approved a loan of $10,216,000 to Spano's Concord II Associates to develop a settlement in Kennett Township, Chester County, Pennsylvania, to be called Falcon's Lair. The loan was settled on February 28, 1988. Bell also approved a loan of $5,435,274 on September 6, 1989, to Spano's Jupiter Bay Development Co. to develop an area to be known as Park Place. Park Place was to consist of thirty-seven single-family townhouses in Upper Providence Township, Delaware County, Pennsylvania. The parties settled the loan on September 18, 1989. Indict. Count Six at ¶¶ 3–4.

The repayment terms of the Park Place and Falcon's Lair loans required Spano's companies to pay to Bell a portion of the proceeds from each sale of a home in the respective developments in return for a release of the lien that Bell held on that individual parcel. *Id.* at ¶ 5. According to the indictment, the usual procedure was that at the settlement the buyer would deliver payment to "an abstract company settlement agent, or a buyer's attorney". *Id.* at ¶ 6. That attorney or settlement agent "would then generate payments to parties entitled to them: a payoff check to Bell Savings Bank, a check to defendant THOMAS V. SPANO'S construction company representing the profit on the construction and sale of the home; and other necessary payments, such as attorney, notary, and title insurance fees, document preparation fees, and school and county taxes." *Id.* at ¶ 6.

On December 15, 1989, the Office of Thrift Supervision of the United States Treasury Department "ordered Bell to cease all commercial real estate, and land acquisition and development loans." *Id.* at ¶ 7. The Resolu-

tion Trust Corporation took over Bell's operations on March 19, 1991. *Id.* at ¶ 8. At the time of the RTC takeover, Spano's Jupiter Bay Corp. was in default on the Park Place loan. *Id.*

The Government alleges that Spano undertook a number of fraudulent activities in relation to his outstanding loans with Bell, the RTC and other banks who lent money in connection with the Park Place and Falcon's Lair developments. For example, Count Five of the indictment charges that in October, 1990, Spano, his construction manager Ronald Hewes, and an Irene Wolfgang (who is not a defendant in this case), submitted a false settlement document to Bell in connection with Ms. Wolfgang's purchase of a townhouse in Park Place to cheat Bell out of a portion of its share of the proceeds.

Ms. Wolfgang agreed to buy Lot # 16 at Park Place in October of 1990, apparently for $265,000. Spano, Hewes, and Wolfgang worked together to convince Bell that Ms. Wolfgang only paid $239,900 for the lot. They convinced Bell to agree "to a reduced cash payoff from the sale of Lot # 16 from Jupiter Bay of $182,601 plus the assignment of a $25,000 note payable to defendant SPANO'S company, Jupiter Bay, from Irene Wolfgang." Indict. Count Five at ¶ 4. The Government alleges that this judgment note was a fiction, *id.* at ¶ 5, and that Spano convinced Hewes "to include a false sales price of $239,900 on the false settlement sheet" Spano sent to Bell. *Id.* at ¶ 6. Hewes signed a second settlement sheet, which he sent to Wolfgang's mortgage company, that included a sales price of $265,000. *Id.* On January 17, 1997, Hewes pled guilty to this charge.[2]

The Government claims that this deception was not unique, and that Spano routinely hid the proceeds of the sales of lots in Park Place and of Falcon's Lair from Bell and other banks, as well as later, from the RTC. *See* Indict. Count Six. Count Six charges that Spano instructed Ronald Hewes "and other SPANO employees attending the settlements not to deliver payoff checks to Bell Savings Bank or to the RTC, and to instead bring the payoff checks to [ ] SPANO'S construction

---

**2.** Interestingly, as part of Hewes's plea agreement, the Government agreed at the time of the sentencing to move to dismiss Count Six of the indictment (against Hewes only), the Count at issue in this Memorandum. *See* Hewes Guilty Plea Agreement at ¶ 3(a)(docket entry 61).

offices." *Id.* at ¶ 12. · Spano also instructed Carl Seitz not to notify Bell or the RTC of settlements which Seitz's company, Academy Abstract, serviced at Falcon's Lair and Park Place. *Id.* at ¶ 13. Seitz, according to the indictment, "was the President of Academy Abstract Company, 705 Haverford Road, Bryn Mawr, Pennsylvania, an abstract company which performed real estate settlement services for the sale of homes constructed by [ ] THOMAS V. SPANO'S construction companies at Brittany, and at other SPANO developments called "Park Place", and "Falcon's Lair" ". *Id.* at ¶ 2.

Seitz's involvement does not end with this alleged omission, however, as the Government claims that on Spano's instruction, Seitz set up "escrow accounts at Meridian Bank, Reading, Pennsylvania, nominally for the benefit of Bell Savings Bank, into which [ ] SPANO caused the deposit of a total of $876,000 in payoff proceeds from the sale of homes at Falcon's Lair and Park Place." *Id.* at ¶ 14. Neither Spano nor Seitz informed Bell or the RTC of the existence of this escrow account or the deposits of the proceeds of sales of Falcon's Lair and Park Place lots into that escrow account. *Id.* at ¶ 14. While Spano and his alleged henchmen engaged in this behavior, the indictment alleges that Spano was negotiating with the RTC for a discounted settlement of his debt on the Park Place and Falcon's Lair loans. *Id.* at ¶ 15.

As part of its liquidation of Bell, the RTC sold the Falcon's Lair and Park Place loans to WAMCO V, a Texas limited partnership. *Id.* at ¶ 17. On July 30, 1993, Spano settled these loans with WAMCO V for less than the amount he owed on them. *Id.* at ¶ 18. Spano then instructed Seitz to return the money in the escrow account, which with interest amounted to $885,974.43, to Spano, which Seitz did. During August and September of 1993, Spano also received back over $300,000 in similarly hidden funds from accounts with which Seitz had no association. *Id.* at ¶ 20.

The only other mention of Seitz in the indictment appears in Count Seven, which does not charge him with a crime.[3]

## II. LEGAL ANALYSIS

As noted above, neither Spano nor Seitz notified the RTC or Bell Savings Bank of the closings they conducted or of the money held in the escrow account. The Government has charged Seitz with concealing assets from the RTC, corruptly impeding RTC functions, and corruptly endeavoring to place assets beyond the RTC's reach, all in violation of 18 U.S.C. § 1032. Indict. Count Six at ¶ 10. The Government also charges Seitz with aiding and abetting in violation of 18 U.S.C. § 2. *Id.*

Seitz moves for dismissal of Count Six on the ground that the conduct charged in the indictment is not a violation of the law. The standard we apply on such a motion is whether the acts alleged in the indictment amount to a violation of the law. *See United States v. Polychron,* 841 F.2d 833, 834 (8th Cir.), *cert. denied* 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988)("If the acts alleged in the indictment do not constitute a violation of law, the indictment is properly dismissed.").

Seitz argues persuasively that because he did not prevent discovery of the assets and he had no affirmative duty to reveal anything to the RTC or to Bell, he cannot, as a matter of law, be guilty of concealing money or information from them. Seitz also moves for dismissal of the aiding and abetting charges on the cognate grounds that he did not act in any way to aid Spano's concealment of the funds and did not have an affirmative duty to reveal any concealment to the RTC or Bell.

### A. Alleged Violation of 18 U.S.C. § 1032

#### 1. Can There be a Concealment Without a Duty to Disclose?

██ The single Count in which the Grand Jury charged Carl Seitz alleges, *inter alia,* a

---

**3.** Home Unity Bank, PaSa, ("Home Unity"), provided $500,000 of the $5,435,274 Park Place loan. Indict. Count Seven at ¶ 2. By June of 1993, when the RTC sold the Park Place loan to WAMCO V, the RTC also had taken over Home Unity. *Id.* at ¶ 3. At that time, Spano still owed Home Unity $230,000. *Id.* Spano and WAMCO V agreed that as part of his settlement of the

Park Place loan, Spano would place $230,000 into an escrow account maintained by Seitz's Academy Abstract Co. *Id.* at ¶ 4. Count Seven charges that, true to form, Spano did not reveal the existence of this escrow account when he entered negotiations with an agent of the RTC, the BJF Group of Kenner, Louisiana, ("BJF"), to settle Home Unity's debt at a discount. *Id.*

violation of 18 U.S.C. § 1032, which provides, in relevant part that:

> Whoever—
>> (1) knowingly conceals or endeavors to conceal an asset or property from ... the Resolution Trust Corporation ...;
>>
>> (2) corruptly impedes or endeavors to impede the functions of such Corporation ...; or
>>
>> (3) corruptly places or endeavors to place an asset or property beyond the reach of such Corporation ... [,]
>
> shall be fined under this title or imprisoned not more than 5 years, or both.

Congress enacted this provision in 1990, but counsel have pointed us to, and we have found, no opinions in this or any other Circuit interpreting its language.[4] Because § 1032 is a criminal statute, we must construe it strictly. As Chief Justice John Marshall observed in 1820:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.

*United States v. Wiltberger,* 5 Wheat. 76, 95, 5 L.Ed. 37 (1820).[5]

Subsection (1) of § 1032 applies to anyone who "knowingly conceals or endeavors to conceal an asset or property" from the RTC. *Black's Law Dictionary* defines *conceal* as "[t]o hide, secrete, or withhold from the knowledge of others.... To cover or keep from sight." Concealment is "[a] withholding of something which one knows and which

one, in duty, is bound to reveal (*e.g.* assets in bankruptcy or divorce proceeding; health condition in insurance application)." *Black's Law Dictionary* 288–289 (6th ed.1990).[6] In the civil fraud context, Pennsylvania courts look to the Restatement (Second) of Torts § 550 to define liability for fraudulent concealment:

> Section 550 states:
>> One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss, as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.
>
> Liability under section 550 is encompassed by the rule that fraud may arise from the making of a knowingly false representation of fact, from an intentional concealment of true facts which is calculated to deceive the other party, or from a nonprivileged failure to disclose facts to the other party. The concealment must be intentional and it must relate to material information. *Mere silence in the absence of a duty to speak, however, cannot suffice to prove fraudulent concealment.*

*Sevin v. Kelshaw,* 417 Pa.Super. 1, 611 A.2d 1232, 1236 (1992)(quoting Restatement (Second) of Torts § 550 (1977)) (citations omitted and emphasis supplied).

In a case involving alleged violation of 18 U.S.C. § 1001, concealment of a material fact from the Government,[7] the First Circuit noted that "in prosecuting a § 1001 concealment violation, it is incumbent upon the government to prove that the defendant had a *legal duty* to disclose the material facts at the time

---

4. Shepard's reveals seven citing cases in all, but they involve sentencing issues in cases where there is a much clearer violation of the law. *See, e.g., United States v. Dickler,* 64 F.3d 818 (3d Cir.1995)(plea bargain), *United States v. Willey,* 57 F.3d 1374 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995) (director of failed bank).

5. The case was argued by Philadelphia's Charles Jared Ingersoll, *id.* at 77.

6. The ordinary meaning of *conceal* is to "keep from the knowledge or observation of others, refrain from disclosing or divulging, keep close

or secret." III *The Oxford English Dictionary* 646 col. 3, def. 1 (2d ed. 1989).

7. Section 1001 of Title 18 of the United States Code provides, in relevant part, that:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

he was alleged to have concealed them." *United States v. Anzalone,* 766 F.2d 676, 683 (1st Cir.1985)(emphasis added); *see United States v. Gimbel,* 830 F.2d 621, 626 (7th Cir.1987)(holding that "[b]ecause the [bank] had no duty to report [defendant's] structured transactions, these transactions did not constitute "material facts" within the meaning of 18 U.S.C. § 1001. Consequently, [defendant] may not be held criminally liable under 18 U.S.C. § 2(b) for causing [the bank] to fail to disclose a material fact").

The Government, in its cryptic response brief, attempts to distinguish *Anzalone* from Seitz's case, asserting that because *Anzalone* dealt with "regulatory crimes," it is inapposite. Gov't. Resp. Br. at 2. We disagree. While the underlying crime alleged in *Anzalone* was currency structuring in violation of Treasury regulations, the Court of Appeals's holding that there is no concealment absent a duty to disclose comes from the court's discussion of a *statute* governing false statements to the government. The regulations were relevant only to the extent that neither they nor any other source of law created a *duty* to reveal information, the breach of which would be a violation of the anti-concealment statute. *Anzalone,* 766 F.2d at 682–83.

Our analysis of the Government's flawed argument as to duty is fortified when we consider what, exactly, we would have to instruct the jury on this point. According to the standard source for federal jury instructions,

> To "conceal" means deliberately to hide, falsify, change, mutilate, or do any act preventing discovery and identification of an object or substance.
>
> To "conceal" can also mean wilfully or deliberately to withhold information or knowledge *required by law to be made known,* or to take any action preventing or impeding the discovery of such information or knowledge.

1 Hon. Edward J. Devitt, Hon. Charles B. Blackmar, *et al.,* *Federal Jury Practice and Instructions* § 16.02 (4th ed. 1992)(emphasis

added). The Government does not allege that Seitz hid, secreted, covered or kept from sight or prevented discovery of the settlement proceeds. To the contrary, the Government alleges that Seitz set up an escrow account *in Bell's name* at a local bank. Indict. Count Six at ¶ 14 ("THOMAS V. SPANO ... instructed defendant CARL SEITZ to establish escrow accounts at Meridian Bank, Reading, Pennsylvania, nominally for the benefit of Bell Savings Bank, into which defendant SPANO caused the deposit of a total of $876,000 in payoff proceeds from the sale of homes at Falcon's Lair and Park Place.").

It is critical to the point at issue that the Government cites only inactions for its allegation that Seitz is a criminal. The Government claims that Seitz (1) "failed to notify Bell or the RTC of the settlement of home sales at Falcon's Lair and Park Place which were serviced by his company," (2) "failed to notify Bell or the RTC of the existence of payoff proceeds from the sale of the homes", and (3) "did not inform Bell or the RTC of the existence of the escrow accounts or the deposit of the payoff proceeds to the accounts." *Id.* at ¶¶ 13–14. The indictment does not close the loop to show that the information was "required by law to be made known" to the RTC.

Having at a minimum disposed of the Government's claim that Seitz's motion is baseless, we turn our attention to the Government's argument that "a violation of § 1032 does not—and should not—rise and fall on a finding of a state civil duty." Gov't. Resp. Br. at 1. To require a finding of a duty to disclose, the Government asserts, "would render the statute meaningless to a large class of persons like Seitz, a real estate title agent, who knowingly performed functions which were critical to the RTC's functions," *Id.* at 1, and "would create disparity in the statute's application based on the civil law of individual states." *Id.* at 1 n. 1.[8]

The Government's concerns are not well-founded. Fundamentally, its reading would

---

8. In view of the fact that the Government has not cited any case from this or any other Circuit where Seitz would be held to have any duty to

the RTC or Bell, we find its concern about legal chaos to be less than compelling.

raise serious due process concerns.[9] For example, *Anzalone* held that to apply criminal sanctions against a defendant for not informing a bank of the structured nature of his transaction, in the absence of a duty to reveal this information, violates the fair warning requirements of the Fifth Amendment. *Anzalone*, 766 F.2d at 682. As the First Circuit explained:

> Although this court, like all other institutions of the United States, is supportive of the law enforcement goals of the government and society, we cannot engage in unprincipled interpretation of the law, lest we foment lawlessness instead of compliance. This is particularly so when the confusion and uncertainty in this law has been caused by the government itself, and when the solution to that situation, namely eliminating any perceived loop holes, lies completely within the government's control. If the government wishes to impose a duty ... let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.

*Id.*

The facts of this case illustrate the need for some limiting principle in the application of a criminal statute whose sweep the Government would have us extend to all persons who "knowingly perform functions which were critical to the RTC's functions." Gov't. Resp. Br. at 1. How, exactly, is an officer of an abstract company to *know* what "functions ... were critical to the RTC's functions"? Should such businessmen be expected to take courses on bank lending to be sure, for example, that they knew "critical" bank "functions" like reserving or obtaining adequate security in real estate lending? And could we find it consistent with the Fifth Amend-

ment's due process requirement to allow criminal sanctions to be visited on people because they are either ignorant of such "critical ... functions" or guessed wrong as to what *was* a "critical ... function"? To ask these questions is surely to answer them.

At a minimum, therefore, in order for the Government to hold Seitz responsible under 18 U.S.C. § 1032 of knowingly concealing an asset or property from the RTC, Seitz must have had a legally-cognizable duty to the RTC to make the existence of the asset or property concealment known.

### 2. Did Seitz Owe a Duty of Disclosure to the RTC?

■ We next turn to the question of whether Seitz was under any duty to reveal, to Bell or to the RTC, the existence of the settlements, the proceeds from the sale of the homes, the existence of the escrow accounts, or the deposit of the settlement proceeds into those accounts.

It is notable that the Government does not allege that Seitz borrowed any money from Bell or the RTC. Nor does the Government allege that Seitz had any sort of contractual agreement or privity with those entities—or, indeed, that he ever had *any* contact with them. Seitz argues that the only duties he was under were those "to the title insurance company that retained his company to conduct the settlement and to Thomas Spano who had entered into an escrow agreement with Academy Abstract." Def. Br. at 5.

■ As Seitz correctly points out, "[u]nder Pennsylvania law, a settlement agent is acting for the title insurance company which in turn is acting on behalf of the buyer; absent some special circumstances, the settlement agent is *not* acting for the seller's creditors such as Bell or the RTC." *Id.* at 5.[10] Seitz's

---

9. The Government's argument also proves too much. On its reading of duty, the United States Attorney could indict and convict the bank officer at Meridian Bank who set up the escrow account, and possibly even the cashier who processed the deposited checks.

10. Our discussion of Pennsylvania law does not mean that we would find that violating a state civil law duty would be tantamount to establishing concealment sufficient to warrant a federal

criminal conviction. *See Anzalone*, 766 F.2d at 682. Federal courts do not create federal "common law" crimes, nor do they expand the reach of criminal statutes absent clear congressional direction. Whether Congress should impose a duty upon everyone performing "functions" related to the RTC's "functions" is thus not for courts to decide. As Chief Justice Burger observed with a dramatic literary example, taken from English history:

role as a middle man at the settlement table is not sufficient to impose on him a duty to the RTC or Bell. *See Hooper v. Commonwealth Land Title Ins. Co.*, 285 Pa.Super. 265, 427 A.2d 215, 217 (1981)("Merely because the [settlement agent] received the funds to satisfy [the judgment creditor of the seller's] judgment does not make it an agent of the creditor."). As the Pennsylvania Superior Court noted in *Hooper*, "title insurance protects the buyer. The duty of the insurer runs only to its insured and not to third parties who are not a party to the contract." *Id.* 427 A.2d at 217.

■ The Government counters this argument by asserting that § 1032 does not require a duty to disclose in order to prove concealment. Gov't. Resp. Br. at 1. We have already rejected this contention. The Government then goes on to fish for duties wherever it might find them, arguing without citation to any case that while Seitz might not have a "duty to persons outside of the title insurance contract[,] . . . Seitz's actions and role related to the charges in the indictment surely constitute a duty for the purposes of whether § 1032 was violated." Gov't. Resp. Br. at 3. To the extent we can decipher this sentence, it would seem to suggest that "surely" a duty to the RTC existed because Seitz sat at the settlement table with Spano, a bad person.

> Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto. The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:
>> "The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal. . . . This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down.. d'you really think you could stand upright in the winds that would blow then?.. Yes, I'd give the Devil benefit of law, for my own safety's sake." R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).
> We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially

Specifically, the Government asserts that Spano hired Seitz "to conduct a series of real estate closings," and that Seitz owed a duty to Spano "to do certain things on behalf of Spano, including facilitating construction loan payoffs to Bell." Gov't. Resp. Br. at 3. The Government continues that "Seitz is charged with purposefully not discharging those duties in order for Spano to ultimately pocket the payoff monies when his workout negotiations with the RTC were complete." *Id.* at 3. The Government also asserts that "[i]t is undisputably the defendant's duty to obtain clean title on behalf of the title insurance company. That duty inherently includes removal of the construction lien by making the payoff. Seitz ignored these duties in order to facilitate the crime." *Id.* at 3 n. 2.

While it is true that Seitz owed a duty to the title insurance company, and that the buyer could have an action against the title insurance company for failing to obtain clean title, nowhere in the Government's response does it point out *any* duty Seitz owed *to the RTC or to Bell.* The mere fact that Seitz may have breached his duties, if any, to Spano, or to the title insurance company or even to the buyer, is insufficient to establish any duty to the RTC or to Bell such that it is appropriate to impose federal criminal liability for nondisclosure.[11]

> decreeing what accords with "common sense and the public weal." Our Constitution vests such responsibilities in the political branches. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978).

**11.** We also believe that analogous authority supports our conclusion that Seitz had no duty to the RTC.

> In the securities area, the Securities and Exchange Commission pressed on the Supreme Court the idea that tippees of corporate insiders "inherited" the insider's duty to disclose under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. The Supreme Court rejected this derivative theory of liability in *Dirks v. SEC*, 463 U.S. 646, 655–64, 103 S.Ct. 3255, 3261–66, 77 L.Ed.2d 911 (1983). *See also Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980)(the duty to speak arises out of a " 'fiduciary or other similar relation of trust and confidence.' ")(quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

For the foregoing reasons, we find that the acts alleged in the indictment do not allege that Seitz violated 18 U.S.C. § 1032(1).

### B. "Corrupt" Actions under § 1032(2) and (3) and Aiding And Abetting Under 18 U.S.C. § 2

■ Likewise, there is nothing in the indictment to suggest that Seitz "corruptly" impeded the RTC's functions, "corruptly" endeavored to place assets beyond the reach of the RTC, or aided and abetted Spano's criminal activities.[12] It appears to us that for the purposes of this motion the standards of culpability under each of these theories are similar enough to address together.

The section-by-section analysis in the legislative history of § 1032 shows that "[t]he corruptly requirement means that the defendant's conduct must be engaged in 'voluntarily and intentionally, and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit or benefit to another.'" H.R.Rep. No. 101–681(I), at 173 n. 3 (1990)(quoting 1 E. Devitt and C. Blackmar, *Federal Jury Practice and Instructions* § 34.08 (3d ed. 1978)), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6579 n. 3. *See also United States v. Rooney,* 37 F.3d 847, 854 (2d Cir.1994), which held that in a prosecution for bribery under 18 U.S.C. § 666, and in light of Congressional direction that the statute was not meant to chill lawful business transactions, the defendant's "conduct in this case cannot be considered 'corrupt' because he violated no official or public duty owed to the government or the public at large."

With regard to 18 U.S.C. § 2, our Court of Appeals has explained that "[i]n order to aid and abet another to commit a crime, it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it, as he

would in something he wishes to bring about; that is to say, that he willfully would seek, by some act or omission of his, to make the criminal venture successful." *United States v. Waller,* 607 F.2d 49, 51 (3d Cir.1979)(quoting with approval the jury instructions of the district judge).

Seitz concisely summarizes our problems with the Government's theories of ancillary or vicarious liability against him:

> According to Count Six, Carl Seitz, at the direction of defendant Spano, set up escrow accounts for the benefit of Bell Savings Bank, paid $876,000.00 in payoff proceeds from the sale of homes into those escrow accounts, and failed to notify Bell or the RTC of the existence of the payoff proceeds; subsequently, at a time when Bell and the RTC no longer had a legal interest in the payoff proceeds, Seitz delivered the total amount of the payoff proceeds, with interest, to Spano who at that time was legally entitled to receive them from Seitz. There is nothing in Count Six to suggest that Carl Seitz stood to benefit financially or in any other way from the concealment of the escrow accounts from the RTC or Bell Savings Bank or that he did any act that furthered the concealment. In the absence of any *act* of concealment by Carl Seitz, the government must necessarily fall back on a theory of *omission,* and a theory of omission brings us right back to our first proposition, *i.e.,* that an omission cannot be charged as criminal conduct in the absence of a duty to reveal.

Def. Reply Br. at 3–4 (emphasis in original).

We agree with Seitz that the aiding and abetting theory, as it must be applied to him, still drives us back to the threshold question of whether Seitz had any duty to the RTC under the circumstances presented here. We have held that he had no such duty, and thus the actions and omissions Seitz allegedly committed could make him no more vicariously or ancillarily liable for Spano's crime

---

**12.** We reproduce the Government's argument as to aider and abettor liability in its entirety:

> Furthermore, the government submits that even if Seitz' actions, in a vacuum, did not constitute a violation of the statute, he has been charged with aiding and abetting, 18

U.S.C. § 2. Since even under Seitz' version of the elements of § 1032, the charges against Spano would stand, Seitz is properly charged as an aider and abettor.

Gov't. Resp. Br. at 4.

.than would be the owner of a gas station where a bank robber regularly filled the tank of his getaway car. The indictment alleges nothing more than that Seitz sat at the settlement table and conducted closings for a company that insured buyers' titles. It does not allege he violated any "official or public duty owed to the government or the public at large." *Rooney, supra.* It does not allege that Seitz "willfully participated" in, or even knew about, Spano's crimes.

For these reasons, we find that the acts alleged in the indictment do not constitute a violation of 18 U.S.C. §§ 2, 1032(2), and 1032(3).[13]

## III. CONCLUSION

In order for an indictment to be valid, the Government must allege that the defendant acted in a way which, if proven, would constitute a violation of the law. *See, e.g., United States v. Polychron,* 841 F.2d 833 (8th Cir. 1988). If the facts alleged do not amount to a crime, then we must dismiss the indictment.

For the foregoing reasons, we conclude that the facts alleged in the indictment against defendant Carl Seitz do not amount to a violation of law, and that therefore the indictment against him should be dismissed. An appropriate order follows.

### ORDER

AND NOW, this 29th day of January, 1997, upon consideration of defendant's motion to dismiss the indictment, the Government's response thereto, and the defendant's reply brief, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. Count Six of the indictment against Carl Seitz is DISMISSED WITH PREJUDICE.

---

13. We also believe that the Supreme Court's jurisprudence in *Chiarella* and *Dirks,* briefly discussed in note 11, also fortifies our view against aider and abettor liability on Seitz because of the bad acts of Spano.