UNITED STATES of America, Appellee,

v.

Seth WAPNICK, Harold Wapnick, Jon Wapnick, and Steven Wolfson, Defendants–Appellants.

Nos. 647, 1305, 648 and 544, Dockets 94–1206, 94–1207, 94–1208 and 94–1209.

United States Court of Appeals, Second Circuit.

Argued April 11, 1995.

Decided July 10, 1995.

Joshua L. Dratel, New York City (Lefcourt & Dratel, P.C., Gerald B. Lefcourt, of counsel), for defendant-appellant Seth Wapnick.

Richard Ware Levitt, New York City, for defendant-appellant Jon Wapnick.

Barry Gene Rhodes, Brooklyn, NY, for defendant-appellant Steven Wolfson.

Harold Wapnick, pro se.

Shari D. Leventhal, Asst. U.S. Atty., Brooklyn, NY (Zachary Carter, U.S. Atty., E.D.N.Y., Emily Berger, Thomas H. Roche, Asst. U.S. Attys., Brooklyn, NY, of counsel), for appellee.

Before: FEINBERG, WALKER and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Appellants Seth Wapnick, Harold Wapnick, Jon Wapnick, and Steven Wolfson appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York (Carol Bagley

Amon, *Judge* ). The jury convicted all four appellants of conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service ("IRS") in collecting income taxes and information regarding cash transactions in excess of $10,000, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 3623; all four appellants of aiding and abetting the filing of false tax returns, in violation of 26 U.S.C. § 7206(2); Harold, Jon and Seth Wapnick ("the Wapnicks") for failing to meet reporting requirements for large cash transactions, in violation of 31 U.S.C. §§ 5313, 5322(b); Harold Wapnick of tax evasion, in violation of 26 U.S.C. § 7201; and Seth Wapnick of making false statements on his tax return, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 3623. The Wapnicks were also convicted of structuring transactions to evade currency transaction reporting requirements, in violation of 31 U.S.C. § 5324, but the district court set aside those convictions prior to sentencing in light of the Supreme Court's holding in *Ratzlaf v. United States,* —— U.S. ——, ——, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994).

Appellants challenge their convictions and sentences on multiple grounds. We find their arguments to be without merit, and we affirm the judgments of conviction as well as the sentences imposed by the district court.

## I

Harold Wapnick, an accountant, operated a tax preparation service called Harold Wapnick & Sons ("the Wapnick business") out of the basement of his home in Brooklyn. The Wapnick business employed Harold Wapnick's sons, Jon and Seth, and Steven Wolfson. A large number of appellants' clients were taxicab operators, including many self-employed immigrant cab drivers. Appellants grew to be a major force in the New York taxi industry, and at one time prepared the tax returns for an estimated 13% of the city's cab drivers—a large number of them immigrants from Haiti, Russia, Israel and other countries. *See* N.R. Kleinfield, *Pursuing Tax Cheats in Land of Opportunity,* N.Y. TIMES, June 16, 1993, at A1, *in* Gov't App. 235.

## A

In the spring of 1988, the Finance Department of the City of New York began investigating allegations that the tax returns prepared by the Wapnick business on behalf of their taxi clients were fraudulent. As part of the city probe, city investigator Joseph McQuillen worked as an undercover cab driver and, appropriately "wired," visited the Wapnick business. There, McQuillen told defendants that he had received a notice from the city requesting taxes due, and that he had not filed any tax returns for the 1985, 1986 or 1987 tax years. The Wapnick business subsequently prepared tax returns for McQuillen for those years, without asking McQuillen about his fares, tips and expenses for those years.

In November 1988, McQuillen told defendants that he had received a notice of hearing from the City and feared a tax return audit. Harold and Jon Wapnick reportedly advised McQuillen to purchase a diary and fabricate maintenance expenses; further, Jon Wapnick allegedly told McQuillen to spill coffee on the diary and scuff it in order to make it appear authentic.

Approximately one month later, IRS agent Kevin Carroll applied for a warrant to search the basement office of the Wapnick business, in support of which Carroll submitted an eleven-page affidavit that reported McQuillen's account of his undercover dealings with appellants and stated also that the Wapnicks' own tax returns appeared to understate their reported gross incomes. Then–Magistrate Judge Allyne Ross issued a warrant for "the basement office of 2024 East 18th Street, Brooklyn, New York," authorizing seizure of a detailed list of items. Pursuant to the warrant, on December 15, 1988, IRS agents searched the basement office of the Wapnick business, seizing a computer and approximately one million documents.

In April 1992, United States Attorney Andrew Maloney and New York City Mayor David Dinkins made a joint appearance at City Hall to announce that defendants had been named in a 152–count indictment charging them with numerous federal crimes aris-

ing out of the activities of their tax preparation business. *See* Dan Jacobson, *Tax Preparers Accused in Tax Scam,* UPI, Apr. 9, 1992.

Prior to trial, Jon and Seth Wapnick moved to have the evidence seized in the December 1988 search and seizure suppressed on multiple grounds. In an opinion dated March 15, 1993, the district court denied the motion to suppress.

### B

Appellants' trial began March 29, 1993, and lasted thirteen weeks. More than seventy witnesses testified for the government, including clients of the Wapnick business, expert witnesses, and McQuillen, the undercover city investigator. The government sought to establish at trial that (1) all four appellants participated in aiding and abetting their clients in filing false tax returns that understated their clients' income; (2) Harold Wapnick evaded tax liability by employing sham corporations to conceal income generated by business activity of the Wapnick family; (3) Seth Wapnick understated his own business income on his tax returns; and (4) Harold, Seth and Jon Wapnick failed to file required reports for cash transactions exceeding $10,000, and structured their cash transactions to evade those reporting requirements.

### 1. The Preparation of False Tax Returns for Taxi Clients

At trial, McQuillen testified about his undercover dealings with the Wapnick business, stating that appellants had prepared his tax returns with fabricated information. Twelve self-employed cab drivers gave similar accounts on the stand, testifying that appellants had prepared their tax returns without the benefit of any information about their fares, tips or expenses. Two drivers and McQuillen testified that appellants coached them on how to fabricate diaries to substantiate the false tax returns.

The returns prepared by the Wapnick business, according to witness testimony, grossly understated the taxi drivers' fare income by claiming that mileage registered on the drivers' meter boxes was actually run up by others to whom the drivers leased the cabs—even though the drivers testified that they had never leased their cabs to anyone, nor told appellants that they had done so.

### 2. Harold Wapnick's Tax Evasion Scheme

Tax returns filed by Harold Wapnick on behalf of the Wapnick business reported taxable income of $5,460 in the 1985 tax year, and $5,908 in 1986. Harold Wapnick did not file a return for the 1987 tax year. The government sought to show at trial that these returns vastly underreported the true income generated by the Wapnick tax preparation service and by a loan and check-cashing business conducted on the side by Harold, Seth and Jon Wapnick. According to government testimony, Harold Wapnick concealed the income derived from the loan and check-cashing businesses by depositing the revenues into thirteen different corporate accounts at Republic National Bank employing unauthorized employer identification numbers belonging to former clients of the tax preparation business. Government witnesses testified that Harold Wapnick's unreported income from accounting fees, check-cashing fees, interest income and capital gains totalled $600,515 in 1985, $787,080 in 1986, and $1,008,325 in 1987.

### 3. Seth Wapnick's False Tax Returns

Seth Wapnick had a business activity of his own—leasing taxi medallions—and was also understating his income on his tax returns, government witnesses testified. According to the government's evidence, Seth Wapnick leased the medallions using three corporations in which he was a shareholder,[1] none of which filed any corporate tax returns for the 1986 or 1987 tax years. According to the government, Seth Wapnick's actual income

---

1. These corporations were the Centurion Taxi Inc., Macar Service Corporation, and Canary Transportation Corporation. Each corporation had a second shareholder in addition to Seth Wapnick. Jon Wapnick was a shareholder in Centurion and Macar, and Martin Fineman was a shareholder in Canary.

from medallion-leasing was $9,862 in the 1986 tax year, and $21,184 in 1987. His tax returns, however, understated this income by 57% in 1986, and by 59% in 1987.

### 4. The Money Laundering Scheme

Financial institutions are required by law to file currency transaction reports ("CTRs") with the Secretary of the Treasury in connection with transactions involving more than $10,000 in United States currency. 31 U.S.C. § 5313(a) (prescribing the filing of CTRs for currency transactions exceeding an amount set by regulation); 31 C.F.R. § 103.22(a) (1986); *id.* (1987) (setting amount at $10,000). Witnesses for the government testified that the Wapnick business routinely cashed checks in amounts exceeding $10,000; yet the Wapnicks never filed any CTRs concerning those transactions.

To fund their loan and check-cashing operations, the Wapnicks frequently made large cash withdrawals from their numerous Republic National Bank accounts. According to the testimony of a bank employee, the Wapnicks would make multiple withdrawals in the same day, invariably totalling more than $10,000, but in sums of just under $9,500 at a time. To break large transactions into smaller ones of less than $10,000 for the purpose of evading CTR requirements—a practice commonly known as "structuring"—is illegal under 31 U.S.C. § 5324. Bank supervisors began taking note of the Wapnicks' withdrawal pattern, and, believing it to be suspicious, began to file CTRs for those transactions.

### C

On June 25, 1993, the jury convicted all four defendants of conspiracy to defraud the United States, and of several counts of aiding and abetting the filing of false tax returns. The jury also convicted Harold, Jon and Seth Wapnick of failing to file CTRs and of structuring transactions to evade reporting requirements; Harold Wapnick of tax evasion; and Seth Wapnick of making false statements on his tax returns.

Following the jury verdict but prior to sentencing, the Supreme Court held that in order for a defendant to be convicted of structuring under 31 U.S.C. § 5324, a jury had to find that the defendant acted with knowledge that the conduct was unlawful. *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. Inasmuch as the Wapnick jury had not been instructed that awareness of illegality was a necessary predicate for a structuring conviction—though the instructions were consistent with the law of the Circuit prior to *Ratzlaf*— the district court set aside the Wapnicks' structuring convictions.

On March 25, 1994, the district court sentenced Harold Wapnick to 66 months' imprisonment; Jon and Seth Wapnick to concurrent terms of 33 months; and Wolfson to concurrent terms of 24 months. In addition, all the appellants were fined, required to pay special assessments, and sentenced to three years of supervised release.

### II

As noted above, the Wapnicks were convicted of structuring under 31 U.S.C. § 5324, but the district court vacated these convictions in light of the Supreme Court's holding in *Ratzlaf.* On appeal, the Wapnicks attempt to use the vacatur of their structuring convictions to attack their convictions on other counts. First, they argue that *Ratzlaf* also compels vacatur of their conspiracy convictions, on the theory that the jury's finding of guilt on the conspiracy counts might have been dependent on the structuring convictions. Second, they argue that the prejudicial spillover from the vacated structuring charges tainted various of the remaining substantive counts, compelling vacatur of those as well. In our view, neither argument is availing.

### A

Pursuant to 18 U.S.C. § 371, it is illegal to participate in a conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." The relevant portion of the indictment charges that the Wapnicks conspired

to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue

Service of the U.S. Treasury Department in its authorized functions of (a) ascertaining, computing, assessing and collecting revenue, namely income taxes, and (b) collecting information regarding transactions in United States currency in excess of $10,000.

The Wapnicks argue on appeal that the Supreme Court's decision in *Ratzlaf* compels the vacatur of not only their structuring convictions, but their conspiracy convictions as well.[2] Since one of the objects of the conspiracy, as specified in the indictment, was to impair the IRS's ability to collect information on cash transactions exceeding $10,000, the Wapnicks contend that the jury might have been led to believe that a finding of guilt on the structuring count would also compel a finding of guilt on the conspiracy charge. Put another way, the Wapnicks' theory is that their § 371 conspiracy convictions might have been premised on violations of the structuring laws. We disagree.

The Seventh Circuit recently considered a virtually identical argument in *United States v. Jackson*, 33 F.3d 866 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995), holding that a conspiracy conviction under § 371 does not require that the government prove a violation of a separate substantive statute. *Id.* at 870. The government may *allege* the violation of a substantive statute in support of a § 371 conspiracy charge, "but such an allegation is only 'a way of consummating the conspiracy ... which, like the use of a gun to effect a conspiracy to murder, is purely ancillary to the substantive offense.'" *Id.* (quoting *Glasser v. United States*, 315 U.S. 60, 67, 62 S.Ct. 457, 463, 86 L.Ed. 680 (1942)).

We believe that *Jackson* is correctly decided and applicable to the case before us. The text of the conspiracy indictment in *Jackson*, 33 F.3d at 689, is nearly identical to the indictment in the present case. In both indictments, impairing the IRS's ability to collect information about cash transactions exceeding $10,000 was listed as an object of the charged conspiracy. And in both cases, the substantive crime of structuring under § 371

was not a necessary predicate of the conspiracy charge.

Seth and Jon Wapnick attempt to distinguish *Jackson*, claiming that, even though the indictment did not specify the substantive crime of structuring as an object of the § 371 conspiracy, the government's argument and the jury charge permitted the jury to find that structuring was not only a *means* to the end of fraud, but that it was the fraud itself. However, our reading of the record does not persuade us that the district court and the government effectively amended the indictment by permitting the jury to find structuring to be an end, rather than a means to an end, of the conspiracy.

**B**

Jon and Seth Wapnick next argue that the structuring violations were inextricably intertwined with the CTR violations under 31 U.S.C. §§ 5313, 5322(b), and the tax-based counts—and thus the vacated structuring conviction prejudiced the jury's consideration of the other counts. In light of the manner in which the government grouped the counts and presented its case at trial, Jon and Seth Wapnick argue, the government's case as to the structuring counts infected the other related counts and rendered the jury unable to separate the different counts. Thus, they argue, the convictions on all counts that might have been tainted by the structuring conviction should be set aside.

█ In assessing a claim of prejudicial spillover from dismissed counts, this Circuit looks to several factors in determining "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir.1994). First, we look at whether the evidence on the vacated count was of such an "inflammatory" nature, *United States v. Friedman*, 854 F.2d 535, 582 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), that it "would have tended to incite or arouse the jury into convicting the defendant on the remaining counts." *Rooney*, 37 F.3d at 855.

---

**2.** Jon and Seth Wapnick press this point in their main brief. Harold Wapnick does not make the argument in his *pro se* main brief, but joins his sons' argument in his reply brief.

We find no evidence in the record that the government's evidence of the Wapnicks' alleged structuring activities was "of the sort to arouse a jury," *United States v. Ivic*, 700 F.2d 51, 65 (2d Cir.1983), nor do we find anything in the record indicating that the jury was likely to give the structuring evidence disproportionate weight in their deliberations on the remaining counts. Structuring was a relatively minor part of the government's case at trial, taking up less than three days of testimony in the three-month span of the trial.

Second, we look at whether the evidence and facts pertaining to the structuring count are similar to or different from those relating to the other counts. *Rooney*, 37 F.3d at 855. In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover. *United States v. Bailey*, 859 F.2d 1265, 1273 n.1 (7th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *United States v. Odom*, 858 F.2d 664, 666–67 (11th Cir.1988). By the same token, where the vacated and remaining counts arise out of completely distinct fact patterns, and the evidence as to both counts is readily separable, there is also no prejudicial spillover. *Rooney*, 37 F.3d at 856; *United States v. Pelullo*, 14 F.3d 881, 898 (3d Cir.1994). Thus, a defendant is likely to make a successful argument of prejudicial spillover

> only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts....

*Rooney*, 37 F.3d at 856.

In the case before us, the charges of structuring and of failing to file CTRs were distinct and separable. The immediate transactions underlying each charge were distinct: The transactions underlying the structuring counts were the Wapnicks' multiple cash withdrawals of amounts just under $10,000 from Republic National Bank; by contrast, the transactions underlying the CTR charges were the Wapnicks' cashing of their customers' unendorsed, third-party checks in amounts exceeding $10,000. Further, the Wapnicks make no showing that the evidence relating to the structuring counts would have been inadmissible had they not been charged with structuring in the first place. *See id.* In light of our finding that the two counts were factually distinct and that the evidence adduced in support of each count could be compartmentalized, "we normally will have undiminished faith that a jury has followed the court's instructions and has evaluated each count on the specific evidence attributed to it." *Id.* This conclusion is bolstered by Judge Amon's charge to the jury on the CTR count, in which she made no reference to structuring.

Third, we make a general assessment of the strength of the government's case on the remaining counts. *Rooney*, 37 F.3d at 856; *United States v. Gjurashaj*, 706 F.2d 395, 400 (2d Cir.1983). Based on our review of the trial transcript, we conclude that the government's case as to the CTR and tax-based counts was sufficiently strong so that there was little or no likelihood that any prejudice from the structuring charge tainted the jury's verdicts on the remaining charges. Thus, we conclude that the presence of the vacated structuring count did not result in or lead to "any spillover effect sufficiently prejudicial to call for reversal" of the remaining counts. *Ivic*, 700 F.2d at 65.

### III

Appellants challenge many of the district court's instructions to the jury, including the instructions regarding the elements of a "sham corporation." The government alleged the existence of at least two sets of sham corporations: (1) the thirteen corporations through which Harold Wapnick established corporate accounts at Republic National Bank—through the unauthorized use of employer identification numbers of the Wapnick business's former tax clients—allegedly in order to evade both tax liability and CTR requirements; and (2) the three corporations through which Seth Wapnick leased taxicab medallions.

■■ The district court's instruction to the jury on sham corporations [3] was based on criteria enumerated by Judge Learned Hand in *National Investors Corp. v. Hoey*, 144 F.2d 466, 468 (2d Cir.1944). We hold that the instruction was not in error. The charge comported fully with *Hoey* and *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943) (defining separate taxable entities), and it was, contrary to Seth Wapnick's claims, neither "overly restrictive" nor "overwhelmingly prejudicial." Whether the corporations used by Harold and Seth Wapnick were actually shams was a question that was properly submitted to the jury. There was, in our judgment, sufficient evidence from which a jury could find the existence of sham corporations, viewing the evidence in the light most favorable to the government. *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991); *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986).

Hence, we find that the district court did not err in its jury charge regarding the question of sham corporations. Nor do we find error in any of the other jury instructions challenged by appellants.

### IV

On appeal, Jon and Seth Wapnick attack Judge Amon's denial of their suppression motion prior to trial. Agent Carroll's affidavit in support of the search warrant alleged that investigator McQuillen had observed "what appeared to be a tax form on the screen of [a] computer" on the Wapnick business premises, and that McQuillen had overheard Seth Wapnick telling another client that all of the client's tax information was in the computer. However, as the government conceded at the suppression hearing, no such tax forms or records were found in the computer or on disks seized from the premises. Thus, appellants argue, in granting the application for a search warrant, the magistrate judge relied on false information in the affidavit, compelling suppression of the evidence.

■ In order to challenge successfully a search warrant based on an attack on the allegations in a supporting affidavit, a defendant "must show by a preponderance of the evidence that the affidavit contained false statements that were material on the issue of probable cause." *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985) (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The defendant must further show that the alleged false statements were made "intentionally, knowingly, or with reckless disregard for the truth." *Id.* The district court held that there was no evidence that Agent

---

3. The court's instructions to the jury on the elements of a sham corporation were as follows:

> It is your responsibility to judge the facts and determine whether the corporations created by [Harold Wapnick] were sham corporations, thereby entitling you to ignore the existence of these corporations in determining whether the government has proved the existence of a tax liability. To assist you in making this determination, I instruct[ ] you as follows:
> If a corporation is organized and established for a purpose that is the equivalent of a business activity or is followed by the carrying on of a business by the corporation, the corporation remains a separate taxable entity. As a separate taxable entity, it would be subject to corporate income tax on its income, and that income would not be included in the shareholder's income. In order to be a separate taxable entity, a corporation must be established for a business purpose and must do business in the ordinary meaning of that term.
> For a corporation to be considered a separate "person" for tax purposes, it must engage in some kind of industrial, commercial or other activity besides avoiding taxation. Thus, a corporation is not considered a separate taxable entity if it is merely a paper corporation, existing only to assist its owners or shareholders to avoid taxation.
> In addition, if a corporation is so controlled by its owners and shareholders that it is being used by those shareholders to advance their own personal purposes rather than to achieve corporate goals, the corporation is said to be merely the alter ego of the shareholders. This is another way of saying that there is no separation between the corporation and its owners or shareholders. When, for example, owners or shareholders move their own funds in and out of a corporate account without any regard for which funds belong to the corporation and which belong personally to the corporation's owners, then a finding that the corporation is merely a sham corporation is proper. The corporation is not to be disregarded, however, merely because a shareholder maintains a detailed direction of corporate affairs.

Carroll either knew that the statements of Investigator McQuillen were false—if indeed they were false—or showed "reckless disregard for their truth," when Carroll incorporated the statements into his affidavit in support of a search warrant.

■ The district court asserted, however, that if an *informant* knowingly or recklessly makes a false statement to an affiant, that does not present grounds to challenge the search warrant so long as the affiant in good faith accurately represents what the informant told him. Mem. and Order of Mar. 15, 1993, (citing *United States v. Navarro*, 767 F.Supp. 544, 547 (S.D.N.Y.1991); *United States v. One Parcel of Property Located at 15 Black Ledge Drive*, 897 F.2d 97, 101 (2d Cir.1990)). As a general rule, this is true when the informant is a private individual. However, when the informant is himself a government official, a deliberate or reckless omission by the informant can still serve as grounds for a *Franks* suppression. *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) ("The Fourth Amendment places restrictions and qualifications on the actions of the government generally, not merely on affiants."). Otherwise, the government would be able to shield itself from *Franks* suppression hearings by deliberately insulating affiants from information material to the determination of probable cause. *Id.*

■ Nevertheless, we reject appellants' challenge of the district court's denial of their suppression motion. There is no evidence in the record that McQuillen knowingly or recklessly made false statements to Carroll in connection with Carroll's preparation of the affidavit. Even if appellants had made such a showing, a *Franks* hearing is required[4] only if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676. McQuillen's alleged false statement constituted only one paragraph of an eleven-page affidavit; even if that paragraph were redacted, the remainder of the affidavit provid-

ed ample probable cause for the search warrant and for the seizure of the computer.

We hold that appellants' other challenges to the district court's denial of the suppression motion are unavailing.

## V

Appellants challenge their convictions, their sentences, and other rulings of the district court on multiple grounds in addition to the ones discussed above. We have considered them all, and we find them to be without merit.

For the foregoing reasons, we affirm the judgments of conviction against all appellants and the sentences imposed on them by the district court.

■

---

4. In any event, it should be noted that in an excess of caution, Judge Amon conducted a

Franks hearing even though she doubted that it was required.