**UNITED STATES of America, Appellee,**

**v.**

**Vytautus VEBELIUNAS, also known as VV, Defendant–Appellant.**

**No. 153, Docket 94–1185.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1995.

Decided Feb. 21, 1996.

As Amended in Response to Petition for
Rehearing April 18, 1996.

Norman A. Olch, New York City, for Defendant–Appellant.

Gordon Mehler, Assistant United States Attorney for the Eastern District of New York, Brooklyn, New York (Zachary W. Carter, United States Attorney, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, of counsel), for Appellee.

Before: OAKES, MINER, and MAHONEY, Circuit Judges.

**MAHONEY**, Circuit Judge:

Defendant-appellant Vytautus Vebeliunas appeals from a judgment entered April 4, 1994 in the United States District Court for the Eastern District of New York, Carol Bagley Amon, *Judge,* that convicted him of eight counts of bank fraud in violation of 18 U.S.C. § 1344 (counts 2, 4–5, 29, 32–33, 38, and 41), fifteen counts of criminal conflict of interest in violation of 18 U.S.C. § 1006 (counts 18–28, 31, 36–37, and 40), sixteen counts of misapplication of credit union funds in violation of 18 U.S.C. § 657 (counts 3, 7–17, 30, 34–35, and 39), and one count of causing the filing of a false loan application in violation of 18 U.S.C. § 1014 (count 42) [1], all stemming from abuses of his relationship with the Kasa Lithuanian Federal Credit Union ("Kasa"). Vebeliunas was acquitted on one count of bank fraud (count 6) and two counts of witness tampering in violation of 18 U.S.C. § 1512(b) (counts 43–44). His conviction on a substantive RICO count for violation of 18 U.S.C. § 1962(c) (count 1) was vacated in response to a posttrial motion as hereinafter described. Vebeliunas also appeals from an order entered December 16, 1994 in the United States District Court for the Eastern District of New York, I. Leo Glasser, *Judge,* that denied Vebeliunas' post-trial motion pursuant to 28 U.S.C. § 455 to vacate the judgment of conviction.

Vebeliunas was sentenced to thirty-six months imprisonment on each count, to run concurrently, followed by three years of supervised release. Judge Amon also imposed restitution in the amount of $581,194, a $60,000 fine, and special assessments totalling $800.

Vebeliunas contends on appeal that: (1) the district court's jury instructions on the conflict of interest counts improperly amended the indictment, and also allowed him to be convicted on the basis of conduct that was not criminal; (2) counts 7–14 were barred by the applicable statute of limitations; (3) the government's failure to call as witnesses the borrowers with respect to the loans at issue on counts 2–4, 11, 14, 16–17, 22, 25, and 27–28 violated his rights under the Confrontation Clause of the Sixth Amendment; (4) the district court erred by allowing the government to request the jury to draw inculpatory inferences from its own witnesses' exculpato-

---

**1.** This count merged into the count 41 bank    fraud charge.

ry statements, thereby undermining the convictions on counts 32–40; (5) the evidence presented to the jury regarding the RICO count that was later dismissed created prejudicial spillover as to all of the remaining counts, requiring the reversal of his convictions on all counts; (6) his motion to vacate the judgment based upon 28 U.S.C. § 455 should have been granted because of an appearance of partiality by Judge Amon; (7) he was denied the effective assistance of counsel by his counsel's failure to interview fifteen potential witnesses; (8) the bank fraud convictions are multiplicitous; and (9) there was insufficient evidence to support his conviction on any count because there was no evidence that he misled Kasa.

We affirm the judgment of conviction and the denial of Vebeliunas' posttrial recusal motion.

## Background

In view of the guilty verdicts that the jury rendered on almost all of the counts submitted to it, the factual recital that follows credits all the jury findings and inferences in favor of the prosecution that the jury might reasonably have drawn from the evidence presented to it.

In 1980, Vebeliunas participated in the founding of Kasa, a federal credit union chartered and insured by the National Credit Union Administration (the "NCUA"). During the 1980s, Kasa acquired assets of more than $80,000,000 and a membership of approximately 6,000, and opened branches in several different states.

Vebeliunas served as Kasa's president and as one of its directors until 1987. During this time, Kasa was headquartered in the same Queens, New York office building where Vebeliunas had his personal business office. At trial, the government introduced evidence that Vebeliunas managed Kasa's daily operations and controlled its loan decisions. Vebeliunas accomplished this by staffing Kasa's credit committee with employees of his other businesses, and by allowing only people who lacked financial sophistication to serve on Kasa's board of directors.

In 1987, Kasa removed Vebeliunas from its board of directors and terminated his presidency. By 1991, many loans to companies under Vebeliunas' control were in default, and Kasa was placed in conservatorship that August. These difficulties ultimately led to the liquidation of Kasa on July 31, 1992.

### A. The Fraudulent Loans.

At trial, the government produced evidence showing that Vebeliunas used his influence to procure a number of improper Kasa loans for the benefit of companies under Vebeliunas' control, including Litas Investing Company, Inc. ("Litas"), Panagra Properties, Inc. ("Panagra"), Litas Travel, World Trade Industries ("WTI"), and Seaview Construction. These companies all had their offices in the same building as did Kasa and Vebeliunas, and there was no physical separation between them and Kasa in that building. Vebeliunas used numerous "straw borrowers," who did not actually receive the proceeds of their loans and who were assured that they would not have to repay the loans, to obtain money from Kasa. Vebeliunas also falsified documents in order to raise capital to fund the ventures of the companies under his control.

### 1. The Beach Club of Marco Island Loans.

In 1984, Vebeliunas formed Panagra in order to acquire the Beach Club of Marco Island (the "Beach Club"), a condominium hotel in Florida. On February 1, Panagra contracted with Broward Management Company to purchase twenty-seven units of the Beach Club for $2,080,812. This transaction required Panagra to produce a down payment of $310,000. Vebeliunas caused Stephen Hill, an attorney and part-time Kasa employee, to file for a loan in the amount of $310,000 from Kasa. Without Hill's knowledge, Vebeliunas later altered the application by changing the amount of the loan to $350,-000. The Kasa board of directors approved the $350,000 loan to Hill based upon the false representation that Hill was in a contractual relationship with Panagra.

Vebeliunas then raised the rest of the money for Panagra to purchase the twenty-seven units by persuading twenty-seven individuals to apply for loans from Kasa. While each loan application stated that the individual was making a deposit of approximately $20,-000 of his "own funds," in fact, each individu-

al paid only $4,750, with the remainder to be supplied by Litas. These twenty-eight loans (including the Stephen Hill loan) were not separately charged in the present prosecution because they were time barred, but the loans were charged as predicate acts under the RICO count.

Next, Vebeliunas sought to acquire the remaining Beach Club units. He paid Edwin Stots $10,000 to file a Kasa loan application in the amount of $700,000 in order to raise the money necessary for this endeavor, and Stots testified that Vebeliunas had told Stots that another person named "Rimas" was doing the same thing. This testimony is corroborated by a Kasa loan application filed by Vebeliunas' wife's brother-in-law, Rimas Valaitis, in the amount of $700,000. The funds from these two loans were subsequently used by Panagra to purchase the remaining Beach Club units.

The Stots and Valaitis loans were never fully repaid. When Kasa was placed in conservatorship, the balance on these loans amounted to approximately $627,000.

### 2. The Club Regency of Marco Island Loans.

Later in the same year, Vebeliunas decided to purchase Club Regency of Marco Island ("Club Regency"), another condominium development located near the Beach Club. The owner, Leonard Masello, was in default of his loan payments to the Naples Federal Savings and Loan Association ("Naples Federal") with respect to Club Regency, and agreed to sell the property.

Vebeliunas raised the money for this purchase by persuading eight straw borrowers each to apply for a $100,000 loan from Kasa. The borrowers knew little or nothing about the purpose of the loans, and Vebeliunas assured them that they would not be liable for their repayment. Approximately half of this money was paid to Masello and to Naples Federal, while the other half was placed in a Kasa account that was drawn down to $5.00 by early 1985. These eight loans were never fully repaid, and a balance of $667,110 was due to Kasa as of the date of conservatorship.

A few months later, the Naples Federal loan fell into default, and Vebeliunas once again resorted to straw borrowers from Kasa to satisfy Naples Federal's demand for $500,-000. Kasa issued loans to Joseph and Raymond Miezelis in the amounts of $150,000 and $350,000, respectively. Once again, the interests of Litas and Vebeliunas in the loan were never disclosed. The loans to the Miezelis were also never fully repaid; approximately $490,000 remained due at the date of conservatorship.

In early 1986, the Naples Federal loan again fell into default, and Vebeliunas caused Edwin Stots to write a check for $125,000 to Naples Federal. Vebeliunas then used funds from Kasa to cover this check. The funds were acquired by means of a loan in the name of Stots' father, who was never made aware of the loan. As of the date of conservatorship, this loan had a balance of $109,-137.39 that remained due.

### 3. The WTI Loans.

WTI was a New York company that engaged principally in the business of exporting industrial equipment and was owned by Vadim Kersha and two other individuals. In 1983, Kersha and his wife each borrowed $50,000 from Kasa, secured by a second mortgage on their home, to meet WTI's ongoing capital requirements.

In 1984, Vebeliunas contracted with Kersha and the other two owners to purchase WTI. In the contract, Vebeliunas promised to cancel or assume the Kershas' Kasa loans. Vebeliunas then hired Romauld Ausmanas, a recent immigrant to the United States, to work for WTI, and convinced him to sign a loan application for $100,000 from Kasa. Vebeliunas used this money to retire the Kershas' loans.

WTI filed for bankruptcy in April 1988. The unpaid balance of the Ausmanas loan amounted to $90,364.35 as of the date of conservatorship.

### 4. The Mill Neck House Loan.

Doretta Fabbri was an employee of Litas Travel. Her testimony was compelled under a grant of immunity after she invoked the Fifth Amendment privilege against self-incrimination.

Fabbri applied for a $525,000 loan from Kasa. This money was used to purchase a

house in Mill Neck, New York. While Fabbri signed the loan application, the rest of the handwriting on the application was not hers. At trial, Fabbri claimed that the loan was genuine, and that she had purchased the house as an investment. Nonetheless, the government argued to the jury that her story was incredible, and that she had in fact been a straw borrower who had "front[ed]" the purchase for Litas.

Fabbri conceded that she could not remember who had completed the loan application, that she was not sure how she had learned about the availability of the Mill Neck house for purchase, and could not remember where the house was in Nassau County. Furthermore, Fabbri apparently received a $3,000 "commission" from Litas for purchasing the house. Litas' bookkeeper, Rima Gudaitis, could offer no explanation why Fabbri was entitled to a commission for purchasing a house as her own personal investment.

### 5. *The Bridge Loans.*

Zenonas Jurys, one of the founders of Kasa and a member of its supervisory committee, and Rimas Vaicaitis, a professor at Columbia University and former president and a director of Kasa, were both longtime associates of Vebeliunas. In July 1985, Jurys and Vaicaitis each applied for $750,000 loans from Kasa. The applications described the loans as "bridge loans," and the loans were repaid shortly after they were made. The funds were to be provided to Vebeliunas to use for business purposes. Neither Jurys nor Vaicaitis had the ability to repay the loans, and Vebeliunas assured them that they would not have to do so.

These loans were approved on July 16, 1985, three days before the applications were completed and submitted to Kasa for consideration. To correct this discrepancy, the applications were backdated to July 10 (Vaicaitis) and 11 (Jurys).

On July 19 and 20, Vebeliunas signed Litas checks in the amount of $3,000 to the order of Vaicaitis and Jurys, respectively. While these checks were recorded as consulting fees, and Vaicaitis and Jurys testified that they were in payment of obligations for genuine services, the government argued to the jury that the payments were in consideration for their acting as straw borrowers.

### 6. *The Lighthouse Shores Loans.*

By 1988, Vebeliunas had been removed as Kasa's president, and Kasa had adopted a policy that forbade the lending of money to entities with which Vebeliunas was connected. Nevertheless, Vebeliunas persuaded Marissa Santangelo, a friend, to take out a loan from Kasa in order to purchase some land in Daytona Beach, Florida called Lighthouse Shores. Vebeliunas had already purchased the judgment in foreclosure on the property, and needed the money from Kasa to reimburse himself. Vebeliunas promised to grant Santangelo a partnership in the property, which was to be held in Santangelo's name.

Vebeliunas caused Santangelo to file the loan application, and to complete a form certifying that she was "not a fiduciary or nominee nor d[id she] represent any other person(s), corporation(s), trust(s), partnership(s) or other legal entity of any nature or description whatsoever." Based upon this misrepresentation, Kasa issued a loan to Santangelo in the amount of $136,000 which, after a number of defaults, was ultimately sold. The general manager of Kasa and a member of its credit committee both testified at trial that the loan would not have been approved if Vebeliunas' interest had been disclosed.

### B. *The Proceedings in the District Court.*

The indictment in this case was issued on December 16, 1992, and the trial was held from September 27 to November 1, 1993, when the jury returned its verdict as previously described. At sentencing, the district court granted a motion by Vebeliunas to vacate the RICO count. The jury verdict had found three of the charged RICO predicate acts not proved. As a result, the jury had not found a predicate act of bank fraud to have occurred after August 9, 1989, the date on which bank fraud became a predicate act for RICO purposes. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73 (the "1989 Act"), § 968, 103 Stat. 183, 506 (1989). The court concluded that the prior predicate acts of bank fraud therefore could not be used to sustain the RICO conviction, that the remaining predicate acts, considered separate-

ly, were time barred, and that the defendant had not waived this limitations defense because it had arisen only as a result of the jury verdict.

The court denied a posttrial motion by Vebeliunas to dismiss the misapplication counts on the basis of the statute of limitations, declined to vacate the remaining convictions on the basis of spillover prejudice from the dismissed RICO count, ruled adversely to Vebeliunas' other applications for posttrial relief, and sentenced Vebeliunas as previously described.

After sentencing, Vebeliunas filed a motion in the district court to vacate his conviction and to disqualify Judge Amon based upon an alleged conflict of interest. Vebeliunas alleged that certain contacts between Judge Amon's husband and individuals who were considering a purchase of the Beach Club in partnership with Vebeliunas created an appearance of partiality on the part of Judge Amon.

The facts underlying the alleged conflict are as follows. In May 1993, Vebeliunas made contact with James Ewell, a real estate investor, regarding a proposal that Ewell purchase the Beach Club, which was by then owned by the NCUA as liquidator. Ewell contacted James Lewis, another real estate investor, in order to try to get financing for the purchase. In addition to looking into raising the necessary money for the Beach Club transaction, Lewis also called Thomas Amon ("Amon"), an attorney and Judge Amon's husband.

Amon received copies of some correspondence that Vebeliunas had sent to Ewell about the Beach Club, and Ewell and Lewis met with Amon in Amon's Manhattan office in July 1993. They discussed the possibility of Amon representing them in the acquisition of the Beach Club. Amon then made a phone call to Thomas Groendyke, a representative of the NCUA, to discuss the proposed transaction. The meeting lasted approximately twenty minutes. Amon was never retained by Ewell and Lewis to represent them in the Beach Club transaction, and did not receive any fee from the real estate investors.

The parties met with Judge Amon on September 8, 1994 to discuss the recusal motion. Judge Amon stated that she had been unaware of her husband's relationship to the Beach Club investors, and that the amount of restitution she had ordered did not include the value of the Beach Club, which had been adequately collateralized. The defense indicated that it wished to elicit Thomas Amon's testimony regarding his involvement with Ewell and Lewis. Judge Amon determined that the motion should be reassigned to another district judge so that she would not have to evaluate her husband's testimony. It was reassigned to Judge Glasser, who denied the motion. *See United States v. Vebeliunas*, No. CR–92–1338 (CBA), slip op. (E.D.N.Y. Dec. 15, 1994). Judge Glasser concluded that neither Judge Amon nor her husband had a financial interest in the outcome of the case, *id.* at 9, and that "these facts cannot reasonably bring into question the impartiality of Judge Amon," *id.* at 11.

This appeal followed.

## Discussion

Vebeliunas' claims of error are set forth at the outset of this opinion. We address them in turn.

### A. *The Jury Instructions Regarding the Conflict-of-Interest Counts.*

■ Counts 18–28, 31, 36–37, and 40 all charged Vebeliunas with violations of 18 U.S.C. § 1006.[2] In charging the jury on these counts, the district court read the statute to the jury and then broke it down into four elements that the government must prove beyond a reasonable doubt: (1) Vebeliunas was "an officer, agent or employee" of Kasa; (2) "[T]he Kasa accounts were insured by the [NCUA];" (3) Vebeliunas "acted with intent to defraud Kasa and/or an examiner of the [NCUA];" and (4) Vebeliunas "participated in, shared in or received money, property, [or] benefits through transactions, loans and acts of [Kasa]."

The district court then explained each of the four elements to the jury. In explaining the fourth element, Judge Amon said: "[T]he

---

**2.** As pertinent in this case, § 1006 stated in relevant part:

> Whoever, being an officer, agent or employee of or connected in any capacity with ... any institution ... the accounts of which are in-

fourth element is, that the government must show that the defendant received directly or indirectly, *or caused another person or entity to receive*, some benefit in loan transactions with Kasa [emphasis added]." In fact, the emphasized portion of the district court's explanation does not correspond to the language of either § 1006 or the indictment.

Vebeliunas argues that Judge Amon's explanation of the fourth element improperly broadened the conduct upon which he could be convicted for violations of § 1006. He argues that because the instruction allows a conviction if Vebeliunas conferred a benefit upon another person, and not upon himself, the charge effected a constructive amendment of the indictment in violation of his Fifth Amendment right to be convicted only for crimes indicted by a grand jury, *see Stirone v. United States*, 361 U.S. 212, 217–18, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960), and indeed allowed him to be convicted for conduct that did not even constitute a violation of § 1006.

■ A constructive amendment occurs when the government's presentation of evidence and the district court's jury instructions combine to "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir.) (collecting cases), *cert. denied,* —— U.S. ——, 115 S.Ct. 258, 130 L.Ed.2d 178 (1994). Constructive amendments "are *per se* violations of the [F]ifth [A]mendment that require reversal even without a showing of prejudice to the defendant." *Id.* (collecting cases).

■ An alternative, and even more fundamental, basis for reversal is presented by Vebeliunas' claim that the district court's instruction allowed him to be convicted for conduct that not only was not charged in the indictment, but is not even proscribed by

§ 1006. "We may not uphold a criminal conviction if it is impossible to ascertain whether the defendant has been punished for non-criminal conduct." *Chiarella v. United States*, 445 U.S. 222, 237 n. 21, 100 S.Ct. 1108, 1119 n. 21, 63 L.Ed.2d 348 (1980) (collecting cases).[3]

Vebeliunas is correct that the language "or caused another person or entity to receive," if read in isolation, would seem to enlarge the proscribed behavior beyond the language of both the indictment and § 1006. The grammatical placement of this language suggests that it is an *alternative* to a benefit to Vebeliunas, as Vebeliunas contends.

■ Nevertheless, we must examine the district court's instruction "in its entirety and 'not on the basis of excerpts taken out of context.'" *Clemente*, 22 F.3d at 483 (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988)); *see also Chalmers v. Mitchell*, 73 F.3d 1262, 1267–68 (2d Cir.1996). In our view, when Judge Amon's explanation of the misapplication counts is examined in full, the challenged language is properly regarded as simply emphasizing the permissibility of convicting even though the benefit to Vebeliunas was indirect.

It is significant that Judge Amon twice correctly told the jury that Vebeliunas must personally benefit either directly or indirectly for them to convict him on the conflict of interest counts. When Judge Amon first read the statute to the jury, she did not mention an alternative allowing conviction if Vebeliunas conferred a benefit upon a third party, and when she broke the statute down into its elements, she again said that Vebeliunas must personally benefit. Only in her subsequent parsing of these elements did Judge Amon make the challenged statement.

This distinguishes the present case from the cases that Vebeliunas cites in support of his position. In *Stirone*, for example, the district court's instruction improperly allowed conviction for the unlawful obstruction

sured by the ... Administrator of National Credit Union Administration ..., with intent to defraud ... such institution ... participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such ... institution ..., shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. A different rule applies when reversal is urged because of an asserted insufficiency of the evidence to support an alternative ground for conviction, rather than an error of law in allowing the jury to consider an alternative ground for conviction. *See Griffin v. United States*, 502 U.S. 46, 59–60, 112 S.Ct. 466, 474–75, 116 L.Ed.2d 371 (1991).

of interstate transportation of either sand or steel, the latter of which was not charged in the indictment. *See Stirone,* 361 U.S. at 214, 80 S.Ct. at 271–72. The jury instruction in *Mollica* permitted conviction if the jury found a conspiracy to defraud the United States "in any manner or for any purpose," while the indictment was limited to income tax fraud. 849 F.2d at 728. There was no ambiguity about the meaning of the court's charge in those cases; the only issue was whether the instruction broadened the indictment.

In contrast, the instant case presents the primary question of what interpretation to give to the district court's instruction. In the context of the jury charge as a whole, we believe that the challenged language in Judge Amon's instruction simply served to underscore the fact that the money could go to entities under Vebeliunas' control rather than having to go directly to Vebeliunas personally.

The plausibility of this interpretation is further strengthened when considered in the context of the facts of the case. Vebeliunas was charged with looting Kasa principally to fund real estate ventures on behalf of a group of companies under his control. The district court undoubtedly felt it necessary to emphasize the fact that benefiting "another ... entity" under Vebeliunas' control would count as an "indirect[ ]" benefit to Vebeliunas himself for purposes of § 1006. The evidence would not support a claim that the sham borrowers who applied for loans from Kasa on behalf of Vebeliunas and his controlled companies were principals for whose independent benefit the loan proceeds were to be applied.

In light of the overall evidence and the language of Judge Amon's instruction taken as a whole, we conclude that there was not "a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury," *Clemente,* 22 F.3d at 482, or for conduct that is not proscribed by § 1006. This conclusion is buttressed by the fact that unlike *Mollica,* for example, where the defendant vigorously objected to the disputed instruction upon which we premised reversal, *see* 849 F.2d at 728, no objection was taken in this case to the instruction that is now challenged on appeal. Thus, as Vebeliunas concedes, he may prevail on this argument only by establishing plain error.

■ To satisfy this standard, the error "must have been prejudicial: It must have affected the outcome of the District Court proceedings." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (collecting cases). Further, when no objection was made below and plain error is accordingly at issue, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* Even if we perceived significant ambiguity in the challenged instruction when read in context, it is clear that in view of the overall evidence presented to the jury, Vebeliunas has not established that the instruction prejudiced him.

In sum, both because the challenged jury instruction, read in context, neither constructively amended the indictment nor allowed Vebeliunas to be convicted for noncriminal conduct, and because in any event Vebeliunas has not established that he was prejudiced by the instruction, we perceive no basis for reversal of the § 1006 convictions.

### B. *Statute of Limitations Defense to Some Misapplication Counts.*

■ Counts 7–14 charge Vebeliunas with misapplication of bank funds in violation of 18 U.S.C. § 657. The conduct charged in these counts occurred in the summer of 1984. At that time, the statute of limitations for this offense was five years, as specified by the general statute of limitations for noncapital offenses provided by 18 U.S.C. § 3282. Effective August 9, 1989, however, a new ten-year statute of limitations for violations of § 657 was established by the enactment of § 961(*l* )(1) of the 1989 Act, 103 Stat. 501 (1989). Section 961(*l* )(1) added § 3293 to Title 18; § 3293 specifies a ten-year statute of limitations for violations of § 657. Section 961(*l* )(3) provides, however, that: "The amendments made by this subsection shall apply to an offense committed before the effective date of this section, if the statute of limitations applicable to that offense under this chapter had not run as of such date." 103 Stat. 501.

Thus, the new ten-year statute of limitations governed conduct that occurred before its effective date only if the statute of limitations otherwise applicable to that conduct had not run as of August 9, 1989. Vebeliunas contends that: (1) he assured the straw borrowers prior to August 9, 1984 that they would not have to repay the loans which they borrowed from Kasa; (2) the violation of § 657 was complete at that juncture; and (3) the five-year limitations period accordingly expired before August 9, 1989. The government argues that the violation of § 657 was not complete until all of the borrowed funds were disbursed, which occurred after August 9, 1984, and in any event that Vebeliunas waived the limitations defense.

Vebeliunas unsuccessfully moved before trial to dismiss counts 7–14 on the basis of the statute of limitations. However, no jury instruction was requested at trial concerning the issue. The issue was raised in a posttrial motion by Vebeliunas for acquittal or a new trial.

The district court denied the posttrial motion at the outset of the sentencing hearing both on the merits and on the basis of waiver. When the matter was again raised later in the sentencing hearing, the government argued against Vebeliunas' limitations defense on both grounds, and the court responded that "in any event" the defense failed on the merits without explicitly reiterating the waiver ground of decision. Vebeliunas contended at the oral argument of this appeal that the court decided the limitations issue solely on the merits, and that we should address only the merits of the issue on this appeal.

We disagree. As we read it, the record does not support Vebeliunas' claim that Judge Amon abandoned the waiver ground

as a basis for denying his limitations defense. In our view, Judge Amon reiterated both grounds when the limitations issue was revisited, but cut off discussion of the waiver issue by noting that she viewed the claim as failing on the merits, as well.

In any event, we do not believe that Vebeliunas waived the limitations defense by failing to request a jury instruction on the issue. His limitations argument is premised upon a legal position that he had argued unavailingly to the district court in a pretrial motion. *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir.1980), upon which the government relies to argue waiver, is distinguishable because the limitations issue in that case was one of fact to be decided by the jury. When, as in this case, the limitations argument is purely an issue of law, there would be no point in requiring a party to seek a jury instruction in the aftermath of an unsuccessful pretrial motion. Vebeliunas raised the issue in a pretrial motion that was denied by the district court. If, as the district court ruled in response to that motion, the date of disbursement of the borrowed funds controls the limitations issue, there was no factual issue left for the jury's consideration. *See infra* note 4. We turn to the merits of Vebeliunas' limitations argument.

Vebeliunas directs that argument to counts seven through fourteen of the indictment. These counts all assert that funds were disbursed at various times in August 1984.[4] Vebeliunas contends, however, that assurances were provided to the straw borrowers prior to August 1984 that they would not be required to repay the loans, that the violation of 18 U.S.C. § 657[5] was complete at that juncture and therefore commenced the running of the statute of limitations, that Judge Amon so instructed the jury, and that

---

4. Count eight states that the funds were disbursed in August 1985, rather than August 1984, but this is apparently a typographical error. The eight $100,000 loans were all part of interconnected financing to acquire Club Regency, as previously described. As to counts eight, eleven, twelve, and thirteen, the indictment alleges that some funds were disbursed before, and some after, August 9, 1984. As to counts seven, nine, ten, and fourteen, the indictment alleges that all funds were disbursed after August 9, 1984. Ve-

beliunas does not contest the disbursement dates alleged in the indictment, and his argument is not premised upon these dates.

5. Section 657 provides in pertinent part:

Whoever, being an officer, agent or employee of or connected in any capacity with...any institution...the accounts of which are insured...by the National Credit Union Administration Board...embezzles, abstracts, purloins, or will-

these counts of the indictment are accordingly time-barred. We disagree.

Vebeliunas invokes *United States v. Stuart,* 718 F.2d 931, 933–34 (9th Cir.1983), in support of this argument. He cites *Stuart* for the proposition that actual disbursement of funds is not required for a § 657 violation. *See* 718 F.2d at 933–34. In that case, the defendant, a bank employee, had prepared a $40,000 cashier's check with the intention to steal that amount from an account at the bank, but the plan was frustrated when a party to whom the check was tendered called the bank for verification, which resulted in the check being dishonored by the bank. Holding "that actual disbursement of money is not required under section 657," *id.* at 934, the Ninth Circuit affirmed the district court's denial of Stuart's motion for acquittal, *id.*

■ The same court has squarely held, however, that in a case where funds are actually disbursed, as here, the crime is complete when the funds leave the control of the institution from which they are misapplied. In *United States v. Musacchio,* 968 F.2d 782 (9th Cir.1991), that court ruled as follows:

A statute of limitations begins to run when "the crime is complete". *Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970) (citing *Pendergast v. United States,* 317 U.S. 412, 418, 63 S.Ct. 268, 271, 87 L.Ed. 368 (1943)). A crime is complete as soon as every element in the crime occurs. The misapplication crime charged in this case was complete on or about June 28, 1983, when the $5.3 million and a note for $4 million left the control of Columbus Savings. The indictment was returned less than five years later, on June 17, 1988. The statue of limitations did not bar the bringing of this action.

968 F.2d at 790; *see also United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987) ("The limitations period is measured from the point at which the crime is complete." (citing *Toussie,* 397 U.S. at 115, 90 S.Ct. at 860)), *certs. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 1996, 100 L.Ed.2d 227, 488 U.S. 982, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988).

We agree with this analysis. Accordingly, because funds were concededly disbursed af-

ter August 9, 1984 with respect to each of the misapplications charged in counts seven through fourteen, *see supra* note 4, the district court correctly ruled that none of these counts were barred by the statute of limitations. We add that Judge Amon did not provide any contrary instruction to the jury. Her charge that "[w]illful misapplication includes situations where the official ... assures a named borrower that he or she will not be responsible for repayment" was directed to defining an element of that crime, not to any determination regarding when the crime is complete so as to trigger the statute of limitations.

### C. *Prejudicial Spillover from Vacated RICO Count.*

■ As previously noted, Judge Amon granted Vebeliunas' posttrial motion to vacate the RICO count at the sentencing hearing. Vebeliunas then argued that spillover prejudice from that count required that his other convictions be vacated. The district court rejected this contention, pointing out that most of the RICO predicate acts constituted separate substantive counts as well, and that the evidence regarding the remaining acts would have been admitted in any event because of their relationship to the overall pattern of conduct charged in the balance of the indictment. Vebeliunas reiterates this claim on appeal, contending that a good deal of the lawyers' arguments and evidence at trial was directed to the RICO counts, and that the racketeering allegations were "compelling[ly] prejudic[ial]," resulting in "retroactive misjoinder."

We addressed this issue in *United States v. Jones,* 16 F.3d 487 (2d Cir.1994), where we said:

"Retroactive misjoinder" arises where joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper. *See generally,* 8 James Wm. Moore, *Moore's Federal Practice,* ¶ 8.06[3] (2d ed. 1993). In this Circuit, "[t]o invoke retroactive misjoinder," a defendant "must show compelling prejudice." *United States v. Novod,* 927 F.2d 726, 728 (2d Cir.) (citations and

fully misapplies any moneys, funds, credits, securities or other things of value belonging to such

institution...shall be fined...or imprisoned...or both....

internal quotation marks omitted), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *see United States v. Warner,* 690 F.2d 545, 553–54 (6th Cir. 1982). Prejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice. *See Novod,* 927 F.2d at 728.

16 F.3d at 493.

■ We have subsequently specified that we consider three factors when a criminal defendant raises a prejudicial spillover argument. *See United States v. Wapnick,* 60 F.3d 948, 953–54 (2d Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3503 (U.S. Jan. 2, 1996) (No. 95–1003) and ___ V.S.L.W. ___ (V.S. Mar 21, 1996) (No. 95–8335); *United States v. Rooney,* 37 F.3d 847, 855–56 (2d Cir.1994). We first examine the evidence introduced in support of the vacated count to see if it "was of such an 'inflammatory' nature that it 'would have tended to incite or arouse the jury into convicting the defendant on the remaining counts.'" *Wapnick,* 60 F.3d at 953 (quoting *United States v. Friedman,* 854 F.2d 535, 582 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), and *Rooney,* 37 F.3d at 855). In the present case, there was little or no evidence pertaining to the RICO count that was not also admissible with respect to the remaining counts of the indictment, and none of it was particularly inflammatory. Further, the fact that it is a RICO count that was subsequently dismissed does not alone suffice to establish prejudice. *See United States v. Ivic,* 700 F.2d 51, 65 (2d Cir.1983), *overruled on another ground, National Org. for Women, Inc. v. Scheidler,* ___ U.S. ___, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). We note in this regard that the district court instructed the jury that the term "racketeering" was "only ... used by Congress to define the offense," and should not influence their "determination of whether the guilt of the defendant has been proven."

■ Second, we must compare the evidence and facts pertaining to the dismissed count with that pertaining to the remaining counts and examine the degree of overlap and similarity between the two. *See Wapnick,* 60 F.3d at 954; *Rooney,* 37 F.3d at 855. "In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant

to make a showing of prejudicial spillover." *Wapnick,* 60 F.3d at 954 (collecting cases). As noted above, virtually all of the evidence pertaining to the RICO count was also admissible with respect to the remaining charges.

■ Finally, we must "make a general assessment of the strength of the government's case on the remaining counts." *Id.;* *see also Rooney,* 37 F.3d at 856. Here, the testimonial and documentary evidence against Vebeliunas as to the remaining counts was very substantial. Thus, all three of the relevant factors weigh against Vebeliunas' prejudicial spillover argument. We conclude that his position lacks merit.

### D. *Remaining Claims.*

We have carefully considered Vebeliunas' remaining claims, which are set forth at the outset of this opinion, and conclude that they are unavailing. As to the recusal claim, we affirm substantially for the reasons stated in Judge Glasser's thorough opinion.

### Conclusion

We affirm the judgment of conviction and the denial of Vebeliunas' posttrial recusal motion.